IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| W.6 Restaurant Group Ltd., d/b/a The Barley House of Cleveland, et al. | ) ) ) | CASE NO. 1:17-cv-02521 |
| Plaintiffs, | ) ) | JUDGE DAN A. POLSTER |
| -vs- | ) ) ) | **PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' EMERGENCY MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER** |
| Richard Bengtson, et al. | ) ) | |
| Defendants. | ) | |

## I.  Introduction

Plaintiffs, W.6 Restaurant Group Ltd., d/b/a The Barley House of Cleveland ("Barley House") and Richie Madison ("Madison"), by and through undersigned counsel, respectfully request that this Court issue an Order denying the Emergency Motion to Dissolve Temporary Restraining Order improvidently filed by the Defendants. The Emergency Motion fails for several reasons.  As a preliminary matter, Defendants failed to establish a proper basis for jurisdiction in this Court, and this matter should be remanded back to the state court without further consideration of the Emergency Motion.  Similarly, the Defendants failed to utilize the proper procedural process outlined in the Federal Rules of Civil Procedure when moving to dissolve the Temporary Restraining Order. Further, and as detailed at length herein, Defendants' thin substantive arguments regarding prior restraint precedent (many of which are not binding on this Court, and none of which implicate the overwhelming cyber-bullying campaign instigated by social media celebrity characters as in this matter), and their claim of irreparable harm, are both unconvincing.

Based on the foregoing, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dissolve Temporary Restraining Order.

## II. Relevant Facts

After a night of partying over Thanksgiving break while Defendant Richard Bengtson was in Cleveland visiting the home of his girlfriend, Defendant Alissa Violet Butler,[1] Defendants both maliciously began waging a cyber-bullying and defamation campaign against the Plaintiffs causing irreparable interference with business and unrelenting infliction of emotional distress. Immediately upon leaving Barley House the morning of Sunday, November 26, 2017 around 2:45 am, the Defendants falsely claimed and published on social media distributed to millions of users:

- "Barley House in Cleveland just literally tried so much shit. They fucked us up in Cleveland. No one go to Barley House, I'm about to file a lawsuit."

- "Barley House in Ohio, Cleveland, fuck this place. These guys just fucking choked me out, cause this guy just tried to grab my girlfriend's ass. Fuck Barley House in Cleveland. This should be on TMZ tomorrow."[2]

As damaging as these defamatory statements are to a business such as Barley House (and its employees, including Richie Madison), in the days that followed, the Defendants used their online fame in a manner designed to (and which they knew was likely to) incite and produce imminent violence, hostile behavior, and other lawless action. *See* Verified Complaint [Doc. # 1-2] at ¶¶5, 27. In the process, Defendants did, and have continued to do, more than merely injure the Plaintiffs' in their trade or occupation using statements; rather, Defendants have caused aggressive stalking behavior, death threats, and other violent conduct to occur against Plaintiffs, individually, and their employees, families, and patrons.

---

[1] *See* https://www.youtube.com/watch?v=k788bW4bTlA&t=1150s from 0:29 to 0:31, where Defendant Bengtson proclaims that he is "going to [Defendant] Alissa's house . . . Alissa's family's house in Ohio." *See also infra* pages 5-6.

[2] Verified Complaint [Doc. # 1-2] at ¶¶34-35.

2

Simply put, this matter is not merely about Defendants' speech (which is not constitutionally protected because the statements are provable falsehoods and threats); instead, this matter is about to promoting the public interest of protecting Plaintiffs and other innocent individuals associated with them from the viscous and uncontrollable mayhem the Defendants have caused through their cyber-bullying campaign.

## III. Law and Analysis

### A. The Court Lacks Jurisdiction to Consider Defendants' Motion to Dissolve

As fully argued in Plaintiffs' Motion to Remand [Doc. 5], diversity jurisdiction under 28 U.S.C. §1332(a) is lacking. Defendant Butler is a citizen of Ohio; and thus, there is not complete diversity of citizenship between the Plaintiffs and Defendants. As a result, the Court does not have jurisdiction to hear Defendants' Motion to Dissolve Temporary Restraining Order, and the case should be remanded to the Cuyahoga County Court of Common Pleas for further proceedings. *See Leys v. Lowe's Home Centers, Inc.*, 601 F.Supp.2d 908, 910 (W.D. Mich. 2009) ("removal statutes permit a district court to remand *sua sponte* where the removing defendant has not carried its burden of establishing removal jurisdiction"); *Metro Hydroelectric Co., LLC v. Metro Parks*, 541 F.3d 605, 610 (6th Cir. 2008) ("Considering whether jurisdiction to hear a case exists is the first and fundamental question presented by every case brought to the federal courts."); *LTC Risk Mgt., LLC v. RMA Brokerage, LLC*, 2006 WL 2707649, *3 (N.D. Ohio Sept. 18, 2006) ("A motion questioning subject matter jurisdiction must be considered before other challenges." "The Court may not reach a merits analysis on LTC's claims where it lacks subject matter jurisdiction.").[3]

---

[3] Based on the Declaration filed in support of Defendants' Opposition to the Motion to Remand, limited discovery should be allowed to resolve the issue of Defendant Butler's citizenship and domicile.

### B. Fed. Civ. R. 59(e) is Not the Proper Avenue to Dissolve an *Ex Parte* Temporary Restraining Order

The Federal Rules of Civil Procedure provide a specific avenue for dissolving an *ex parte* temporary restraining order through Fed. Civ. R. 65(b)(4). This rule provides:

> **(4) Motion to Dissolve.** On 2 days' notice to the party who obtained the order without notice—or on shorter notice set by the court—the adverse party may appear and move to dissolve or modify the order. The court must then hear and decide the motion as promptly as justice requires.

Fed. Civ. R. 65(b)(4). This is the express avenue provided by the federal rules for dissolving an *ex parte* temporary restraining order, not Fed. Civ. R. 59(e). As Defendants have improperly filed their Motion to Dissolve "pursuant to Fed. Civ. R. 59(e)" and did not provide the required notice under Fed. Civ. R. 65(b)(4), the Motion to Dissolve is procedurally deficient and should be denied.

### C. Even the Most Stringent of Free Speech Protections Do Not Protect the Defendants

Beyond the basic procedural deficiencies with Defendants' Emergency Motion, their request also lacks substantive merit. The subject string of defamatory posts and "vlogs" [4] from the Defendants is a playbook on how to incite violence with words and images – in the process, the Defendants placed Plaintiffs, their families, employees, patrons and the surrounding community in fear of their safety and security and in jeopardy of death or bodily harm. The state court TRO restores order and peace, evens the scales, and prevents the Defendants from further using their online fame to incite and produce imminent violence, hostile behavior, and other lawless action.

Defendants' First Amendment arguments are unavailing.

---

[4] A "vlog" is "a blog that features mostly videos rather than text or images." http://www.dictionary.com/browse/vlog.

4

*First*, it is beyond reproach that "the government may proscribe libel." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 384 (1992). Indeed, "defamation" is "constitutionally proscribable content." *Id.*; *cf. United States v. Varani*, 435 F.2d 758, 762 (6th Cir.1970) ("speech is not protected by the First Amendment when it is the very vehicle of the crime itself"). In this case, the state court TRO is a constitutional restraint on the ability of the Defendants to further defame and injure Plaintiffs through their online fame.

Despite Defendants' protestations, preventing prior restraint is not a bar to injunctive relief to prevent the harms of defamatory speech." *N. America Recycling, LLC v. Texamet Recycling, LLC*, S.D.Ohio No. 2:08-CV-579, 2012 WL 3283380, *1, citing to *Lothschuetz v. Carpenter*, 898 F.2d 1200, 1208–09 (6th Cir.1990). As discussed hereafter, the TRO is necessary to avoid true threats of imminent lawless action. To the extent that it is necessary, the parties can also use a preliminary injunction hearing to confirm the falsity of the Defendants' statements and to continue the injunction against any further publishing thereof.

Although Defendants quote a decision from the Southern District of Ohio to suggest "[i]t is well-settled that an injury to reputation is insufficient to justify the issuance of a preliminary injunction,"[5] in fact the Sixth Circuit recently confirmed that:

> An injury is irreparable if it is not fully compensable by monetary damages, that is, the nature of the plaintiff's loss would make damages difficult to calculate. **That includes loss of customer goodwill.**

*Southern Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 852 (6th Cir. 2017) (internal quotations and citation marks omitted) (bold added). "The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such

---

[5]*Alahverdian v. Nemelka*, No. 3:15-CV-060, 2015 WL 1276453 at *3 (S.D. Ohio) (quoting *Hammer v. Trendl*, 2003 WL 21466686 at *3 (E.D.N.Y.2003) and citing *Stewart v. United States Immigration & Naturalization Serv.*, 762 F.2d 193, 199-200 (2d Cir.1985)). *See* Doc. # 3 at PageID # 53.

5

losses are difficult to compute." *Scott*, 973 F.2d at 512. In this case, the same is true of the damage and negative impact to Plaintiffs' reputation and the loss of customer goodwill directly caused by Defendants' defamatory, tortious and injurious statements and conduct. These damages are difficult, if not impossible, to calculate. Plaintiffs simply cannot afford any further loss to their reputation as a result of the Defendants' abusing their Internet platform and audience.

**_Second_**, the Defendants' threats of violence and incitement enjoined by the state court TRO comfortably fall outside any protection of the First Amendment.

The First Amendment does not "protect the right of citizens to speak for *any purpose*," and the First Amendment right to free speech is not unlimited. *D.C. v. Heller*, 554 U.S. 570, 595 (2008) (emphasis in original). The Supreme Court recognizes exceptions to free speech, one such exception being that "threats of violence are outside the First Amendment." *R.A.V.*, 505 U.S. at 388. Such a "prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." *Virginia v. Black*, 538 U.S. 343, 360 (2003); *accord R.A.V.*, 505 U.S. at 388 (same). As the Supreme Court explained at length relevant to the circumstances here:

> The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur. Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.

*Id.* at 359-360 (internal citations and quotation marks omitted). Relatedly, and similarly, where speech "is directed to inciting or producing imminent lawless action and is likely to incite or

6

produce such action," the government may forbid or proscribe such speech. *Brandenburg v. Ohio,* 395 U.S. 444, 447 (1969).

Important to this matter is the evaluation that "the character of every act depends upon the circumstances in which it is done," *Schenck v. United States*, 249 U.S. 47, 52 (1919). Defendants rely upon authority which is archaic and inapplicable to the circumstances presented here (not to mention non-binding in many instances) because of the ever changing landscape of the Internet, social media and cyber-psychology. In this case, the state court TRO targets the very type of speech and the medium exploited by the Defendants to enrich themselves and to threaten the Plaintiffs with violence, bodily harm, and even potentially death.

In issuing the TRO, a court must consider whether the audience, under the circumstances, will be incited into lawless action. Here, we know the answer is a resounding "Yes!" because the Defendants and those acting in concert with them engaged in lawless action by stalking, threatening, defaming, and bullying the Plaintiffs, their employees and the patrons.

When evaluating whether additional statements by Defendants will incite the audience into further lawless action, the answer again is a resounding "Yes!" and the injunctive relief is necessary and warranted.

The expansion of social media platforms renders the previous evaluations of prior restraint incomplete. In other cases of threats of bodily harm and death, courts would delve into the terms of the threatening behavior and the likely response of the recipient. Those cases often dealt with charged ideologies such as anti-abortion or animal rights activists. See for example, *Planned Parenthood v. American Coaltion of Life Activists,* 290 F.3d 1058 (9th Cir. 2002) (posting wanted posters of abortion providers did not meet "imminence" requirement but satisfied "true threat" because of prior actions) and *United States v. Fullmer* 584 F. 3rd 132 (3rd

7

Cir. 2009) (posting home addresses and personal information of employees who worked at animal testing facility constituted a true threat).

Here, the Defendants, or more accurately – the Defendants' characters – develop such a loyal online following that, when the Defendants are in any adverse situation, whether actual or perceived, it will result in a fanatic response of imminent harm and lawless action. The threat is only exacerbated, as has been made evident here, when the Defendants fan the flames of incitement. The effects of narcissistic leadership over sycophant followers render the injunctive relief mandatory here to prevent the true threats of imminent bodily harm and other lawless action.

Relatedly, the state court TRO merely enjoins the Defendants from further using their online fame in a manner which is designed, known to, and likely to incite and produce imminent violence, hostile behavior, and other lawless action ***directed specifically at Barley House Cleveland and Richie Madison*** (as opposed to the public at large). The Defendants specifically *targeted* this specific entity and specific employees and agents.

In an attempt to skirt liability for their intentional and malicious conduct, Defendants have filled their Motion with unsupported and conclusory assumptions that the threatening statements made to Plaintiffs, their employees, and their patrons cannot be attributed to them.[6] However, the reality of the matter is that Defendants' first publications, which stated as fact that Plaintiffs engaged in criminal, reckless, or tortious behavior, purposefully set in motion a chain

---

[6] S*ee* Defs' Motion at 9 ("The fact that such speech is made between computer users geographically distant and separated by screens and servers also significantly weighs against a prior restraint based on an alleged true threat."); *see also* Defs' Motion at 11 ("[A]ny threats or 'trolling' against them on the Internet either did not come from Defendants or anyone under Defendants' control, or were otherwise not outside the ambit of the First Amendment. Liability for statements by third parties - almost all the statements at issue here - cannot be attributed to Defendants.").

8

of malicious expressive behavior and conduct not entitled to constitutional protection under *Brandenburg* and similar precedent.

Defendants and those persons acting in concert and at the direction of the Defendants have continued to engage in their cyber-bullying campaign and stalking behavior not from behind a computer screen or server, but in person and within such close distance that they pose an imminent threat to Plaintiffs. As just one of many examples of the imminent danger to Plaintiffs and their employees, at least one follower of Defendants drove to the home of a general manager of the Barley House, took a picture of her home, and forwarded the message directly to the manager's private Facebook messenger account. *See* Exhibit A to Plfs' Verified Complaint. This conduct goes beyond a mere invasion of privacy and instead was designed for one purpose: to cause the manager to experience fear of imminent harmful contact.

Any attempt by Defendants to allege that these statements are from persons geographically distant from Plaintiffs is overreaching and an impermissible assumption in light of what has transpired to date. Defendants knew or should have known that some of their millions upon millions of followers have the ability to cause imminent harm to Plaintiffs, and it is irresponsible for them to assume otherwise.  The Defendants do not need to instruct their followers to "go harm this person."  Rather, as is evident here, when the Defendants say "I have been wronged by this person," enough of their followers interpret that to mean "Go harm this person!" to warrant the injunctive relief.

The Defendants' statements went, and continue to go, beyond mere opinions, ideas, or critiques of Plaintiffs in their capacity as professionals in the restaurant industry. The statements go beyond mere intrusion into Plaintiffs' privacy interests. *Nyer v. Munoz-Mendoza*, 385 Mass. 184, 189 (1982) (explaining that mere intrusion on a person's alleged privacy interest is not by

itself an adequate base on which to predicate a broad prior restraint on another's free speech). Rather, the statements in this case are libel, threats, or speech intended to and likely to incite **imminent illegal conduct**. Such speech and its intended consequences are not constitutionally protected under *Brandenburg*, and at minimum, may be restricted as they are defamatory. *Cantrell v. Forest City Publ'g Co.*, 419 U.S. 245, 253-54 (1974) (concluding that civil liability for offensive knowing falsehoods was constitutional); *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964) (suggesting that criminal liability for defamatory falsehoods was constitutional); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (concluding that civil liability for defamatory falsehoods was constitutional); *Balboa Island Village Inn, Inc. v. Lemen*, 40 Cal.4th 1141, 1147, 156 P.3d 339 (2007) (explaining that "there are categories of communication and certain special utterances to which the majestic protection of the First Amendment does not extend because they … are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.… Libelous speech has been held to constitute one such category.") (internal citations omitted); *see also Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245-246 (2002) ("The freedom of speech has its limits; it does not embrace certain categories of speech, including defamation . . . ."). It is this speech that the state court TRO prescribes, and such speech simply does not impinge on the Defendants' rights to free speech.

  ***Third***, even assuming *arguendo* that the First Amendment was implicated, it is evident that the restraint enjoining the Defendants from "publishing on social media platforms any statements, videos, or images concerning Plaintiffs, their employees, their related entities, and their patrons" is in fact constitutional because it is "narrowly tailored to further compelling governmental interests." *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003). To begin,

10

the Defendants do not dispute that public safety and order (both at issue here) are compelling governmental interests, nor could they. *Grider v. Abramson*, 180 F.3d 739, 749 (6th Cir.1999). Further, the Supreme Court has repeatedly recognized a state's interest in protecting citizens from "unwanted communications." *See McQueary v. Stumbo*, 453 F.Supp.2d 975 (E.D.Ky.2006). For example, in *Frisby v. Schultz,* in analyzing a facial challenge to an ordinance that the Court interpreted as prohibiting picketing in front of a residence, the Court explained that "[p]reserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value." 487 U.S. 474, 484 (1988) (internal citations omitted).

Now, with the advent of cyber-bullying campaigns, men and women require protection not only from physical invasions of their home, but also from unwanted cyber-attacks, harassment, and online abuse and potential violence. It is in the best interest of the public to prevent such cyber-bullying campaigns, which do nothing more than spread hatred, ridicule, and threatening statements on a national and global scale. *S. J. W. v. Lee's Summit R-7 School Dist.*, 696 F.3d 771, 779 (8th Cir.2012) (explaining that "[t]he repercussions of cyber-bullying are serious and sometimes tragic."). Some courts have begun to recognize the need for such protection against cyber-bullying. *E.g. Hartzell v. Cummings*, C.P. No. 150103764, 2015 Phila. Ct. Com. Pl. LEXIS 313, at *7 (Nov. 4, 2015) (enjoining a defendant from continuing to embark on his "online campaign of harassment against [the Plaintiff]" because Defendant's intent was "not to exercise his constitutional right to disseminate information, but rather to conduct an illegal campaign of harassment" directed at Plaintiff); *see also Patriot Group, LLC v. Fustolo (In re Fustolo),* Bankr.D.Mass. Nos. 13-12692-JNF, 15-1015, 2015 Bankr. LEXIS 295, at *4-5 (Jan. 30, 2015) (a case in which the court granted Plaintiff's request for injunctive relief based on

allegations in the Verified Complaint that the Defendant had "engaged in cyber-bullying, including postings [false information] on websites, blogs, and consumer complaint boards to the effect that the Plaintiff, its principal, and affiliated businesses" had engaged in unlawful conduct and were being investigated for various forms of fraud). These cases and similar precedent acknowledge that "First Amendment values must be balanced against competing societal interests, such as …preventing harassment, cyber bullying, stalking and like behavior under certain limited circumstances," societal interests which are at stake in this case. *Hartzell* at *7, citing to *City of Los Angeles v. Preferred Commc'ns. Inc.*, 476 U.S.488, 488 (1986) ("where speech and conduct are joined in a single course of action, the First Amendment values must be balanced against competing societal interests").

The rationales employed in these recent cases analyzing the novel issue of cyber-bullying against the backdrop of the First Amendment all serve to support the conclusion that the state court TRO is narrowly-tailored to compelling governmental interests. "[N]arrowly-tailored" is not synonymous with "perfectly tailored." *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1671 (2015) (quoting *Burson v. Freeman*, 504 U.S. 191, 209 (1992)). "The First Amendment does not confine a State to addressing evils in their most acute form." *Id.* In this case, the state court TRO is specific, limited, and narrowly-tailored to protecting the safety and security of the Plaintiffs, their employees, and patrons from further abuse and cyber-bullying. While the state court TRO may not be "perfectly tailored," there can be little question that it is "narrowly-tailored" to addressing, in their most acute form, the evils that accompany the Defendants' defamatory and tortious discourse about the Plaintiffs that, left without court intervention, would unquestionably infringe upon the public safety, disrupt order, and lead to further threats of death and bodily harm.

***Finally***, the Defendants' claim that the non-contact provisions of the state court TRO violate the First Amendment is specious at best. If that were true, then every single civil protection order in state courts across the country would violate the First Amendment – a truly absurd result. Instead, Defendants selectively ignore the ***in-person*** violence they were responsible for instigating ***on-site*** at Barley House Cleveland. No First Amendment freedom is implicated by the Defendants' desire to party and cause disruption. Instead, the state court TRO is necessary to protect the safety and security of Plaintiffs, their employees, and patrons from the Defendants (and all others working in active concert with them) from inflicting any further destruction at Barley House Cleveland and carrying out the following true threats:

"You're fucked" (directed at Plaintiff Madison) (Doc. # 1-2 at PageID # 35);

"I will kill you, you fucking pussy. I will fucking kill you" (*id.* at PageID # 38); and

"We can ruin you!" *Id.* at ¶36.

In short, the state court TRO does not run afoul of the First Amendment, but rather is a valid, constitutional prior restraint.

### D. The State Court TRO Serves the Public Interest, and Does Not Cause Defendants Any Irreparable Harm

The TRO does not irreparably harm the Defendants, but rather is narrowly-tailored to serve the aforementioned compelling state and societal interests. In particular, the TRO protects and safeguards Plaintiffs and their employees who have had their substantial privacy interests invaded in intolerable manners by Defendants or persons in active concert with Defendants. Plaintiffs, their employees and family members are now in a position where they are a captive audience unable to avoid the objectionable, hateful, and threatening speech and conduct directed at them and set in motion by Defendants without intervention of the Court. The TRO simply restores the parties to their original position prior to the Defendants' wrongful conduct. Thus,

contrary to their allegations, there is no irreparable harm to Defendants, and in fact the public interest is served.[7]

"To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (internal citations omitted). Here, Defendants were able to gain "4 million plus subscribers" without referencing Plaintiffs in their social media posts prior to the incident at Barley House, and they are not likely to lose these subscribers in the next few days based on the inability to post about Plaintiffs or the incident. Importantly, the Defendants remain free to own and operate their webpages and social media pages (simply minus the highlighted defamatory, unlawful content), and remain free to publish truthful information on social media not in violation of the order consistent relevant precedent. *E.g. Hartzell* at *7.

The state court TRO does not ban the Defendants from using social media – their main source of generating income. Indeed, the Defendants can communicate and speak about an infinite number of topics and issues (both on social media and through any other means). Moreover, both of the Defendants are free and not restrained from speaking or talking about Plaintiffs, their employees, their related entities, and their patrons outside of social media (as long as such communications are not defamatory or misleading). Defendants can freely publish

---

[7] In an attempt to show irreparable harm, Defendants allege that they are "social media personalities who make their living through social media including by posting YouTube videos," and that being prevented from publishing statements regarding Plaintiffs will, in some inexplicable way, impair that livelihood. Defs' Motion at pg. 2. They further allege that Defendants' "primary, if not sole, means of publicity and communication (not to mention income) is through the Internet and social media." Defs' Motion at pg. 3. Notwithstanding the fact that this allegation sheds light on what is likely Defendants' ulterior motive in publishing false and destructive statements in the first place (i.e., to gain followers and draw attention to earn a profit), Defendants' allegations fail to demonstrate irreparable injury. Such conduct is not unfamiliar to Defendant Bengtson who openly admits to engaging what amounts to unlawful conduct for his fans and to gain followers. For example, Defendant Bengtson engaged in similar conduct at Target. See https://www.youtube.com/watch?v=ylGMs3nzizk at 6:10 (there's no excuse for [Defendant's conduct at Target], I'm just kind of an asshole. I want do it for the blog, just to make [the followers] laugh."

14

– and profit from – other expressive or opinion-based content not in violation of the Order, but they may not profit from the harm they have caused and continue to cause Plaintiffs.

The Defendants have not suffered, and will not suffer, any irreparable harm. Plaintiffs were forced to seek immediate relief and there will be prompt judicial determinations made as to the validity of the restraint. To dissolve the TRO at this stage, a device which is short by its nature, defeats the purpose of having this procedural mechanism available to protect Plaintiffs against the death threats, irreparable interference with business, unrelenting infliction of emotional distress, and pervasive defamatory statements by the Defendants and those working in active concert with the Defendants. In short, the TRO is narrowly-tailored to serve compelling state interests, and does not irreparably harm the Defendants.

## IV.   Conclusion

Notwithstanding the jurisdictional and procedural matters above, the false statements made by Defendants and those in active concert with Defendants do more than merely injure the Plaintiffs' in their trade or occupation; instead, they impute fraud, want of integrity, or misconduct, and incite violent behavior against Plaintiffs, their employees, families, and patrons. This type of speech is not constitutionally protected because the statements are provable falsehoods, threatening, or some other sort of speech that falls within an existing First Amendment exception. The equities between the parties weigh in favor upholding Plaintiffs' relief (which simply restores and maintains the status quo), and the public interest weighs in favor of preventing such abusive cyber-bullying.

Based on the foregoing, Plaintiffs respectfully request that the Court deny Defendants' Emergency Motion to Dissolve Temporary Restraining Order.

Respectfully submitted,

/s/ Christopher B. Congeni
Christopher B. Congeni (#0078160)
Adam D. Fuller (#0076431)
Chad R. Rothschild (#0088122)
**BRENNAN, MANNA & DIAMOND, LLC**
75 East Market St.
Akron, Ohio 44308
Telephone:  330.253.5060
Facsimile:  330.253.1977
Email:  cbcongeni@bmdllc.com
            adfuller@bmdllc.com
            crothschild@bmdllc.com

/s/ Jeffrey C. Miller
Jeffrey C. Miller (#0068882)
**BRENNAN, MANNA & DIAMOND, LLC**
200 Public Square, Suite 3270
Cleveland, Ohio 44114
Telephone:  216.658.2155
Facsimile:  216.658.2156
Email:  jcmiller@bmdllc.com

*Counsel for Plaintiffs*

### CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of December 2017, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Christopher B. Congeni
*Counsel for Plaintiffs*

4818-0451-3368, v. 1