UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| W.6 Restaurant Group Ltd., d/b/a The Barley House of Cleveland, et al. | ) ) ) | CASE NO.: 1:17-cv-02521 |
| | ) | JUDGE DAN AARON POLSTER |
| Plaintiffs | ) ) | **RICHARD BENGTSON'S BRIEF IN** |
| v. | ) ) | **RESPONSE TO ORDER SETTING** |
| | ) | **CONTEMPT HEARING** |
| Richard Bengtson, et al. | ) ) | |
| Defendants | ) ) | |

Defendant Richard Bengtson ("Bengtson"), by and through his undersigned counsel, submits his Brief in Response to Order Setting Contempt Hearing.  For the reasons set forth below, the Court should not hold Bengtson in contempt or in breach of the private partial settlement agreement entered into by the parties in lieu of the Court's preliminary injunction hearing.

(01125448-1)

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................................................ ii

**TABLE OF AUTHORITIES** ........................................................................................ iii

**ISSUES TO BE DECIDED** .......................................................................................... 1

**SUMMARY OF THE ARGUMENT** ............................................................................ 1

**BACKGROUND** ............................................................................................................ 2

**ARGUMENT** .................................................................................................................. 5

   **I.**   **Contempt Is Not an Appropriate Sanction Because Bengtson Did Not Violate Any Court Order** ................................................................................. 5

   **II.**   **Bengtson Did Not Violate the Partial Settlement Agreement.** ..................... 8

   **III.**   **The Order Contains an Unconstitutional Prior Restraint in Violation of the First Amendment** ........................................................................... 11

      **A.**   **Bengtson's Protected Speech Is Unlawfully Curtailed by the Order.** ....................................................................................... 11

      **B.**   **Bengtson's and the Public's Interest Will Be Significantly Harmed if the Injunctive Aspect of the Order Is Allowed to Stand or Continue.** .................................................................. 16

**CONCLUSION** ............................................................................................................ 17

**CERTIFICATE OF COMPLIANCE** ........................................................................ 18

**CERTIFICATE OF SERVICE** ................................................................................. 18

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Alexander v. United States,*
  509 U.S. 544 (1993) .................................................................................. 11

*Ashcroft v. Free Speech Coalition,*
  535 U.S. 234 (2002) .................................................................................. 13

*Boos v. Barry,*
  485 U.S. 312 (1988) .................................................................................. 12

*Brandenburg v. Ohio,*
  395 U.S. 444 (1969) .................................................................................. 13

*Burge ex rel. Burge v. Colton Sch. Dist. 53,*
  100 F. Supp. 3d 1057 (D. Or. 2015) .......................................................... 15

*CBS Inc. v. Young,*
  522 F.2d 234 (6th Cir. 1975) ..................................................................... 12

*Chaplinksy v. New Hampshire,*
  315 U.S. 568 (1942) .................................................................................. 15

*Christina A. v. Bloomberg,*
  315 F.3d 990 (8th Cir. 2003) ....................................................................... 8

*City of Paducah v. Investment Entertainment,*
  791 F.2d 463 (6th Cir.1986) ....................................................................... 16

*County Security Agency v. Ohio Dep't of Commerce,*
  296 F.3d 477 (6th Cir. 2002) ..................................................................... 11

*D. Patrick, Inc. v. Ford Motor Co.,*
  8 F.3d 455 (7th Cir. 1993) ........................................................................... 8

*Dayton Area Visually Impaired Persons, Inc. v. Fisher,*
  70 F.3d 1474 (6th Cir. 1995) ..................................................................... 17

*Electrical Workers Pension Trust Fund of Local Union No. 58 v. Gary's Elec. Serv. Co.,*
  340 F.3d 373 (6th Cir. 2003) ....................................................................... 6

*Elrod v. Burns,*
  427 U.S. 347 (1976) .................................................................................. 16

*G & V Lounge Inc. v. Michigan Liquor Control Comm'n*,
   23 F.3d 1071 (6th Cir. 1994)............................................................................... 17

*Gascho v. Global Fitness Holdings, LLC*,
   875 F.3d 795 (6th Cir. 2017).................................................................... 1,5,7, 8`

*Glover v. Johnson*,
   138 F.3d 229 (6th Cir. 1998)................................................................................ 6

*Hall v. Chamberlin*,
   No. 4:12CV0460, 2012 U.S. Dist. LEXIS 161471 (N.D. Ohio Nov. 5, 2012)........................ 7

*Hess v. Indiana*,
   414 U.S. 105 (1973).......................................................................................... 13

*In re White*,
   No. 2:07CV342, 2013 WL 5295652 (E.D. Va. Sept. 13, 2013) .................................. 13, 14, 16

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994)......................................................................................... 7, 8

*Layshock v. Hermitage Sch. Dist.*,
   496 F. Supp. 2d 587 (W.D. Pa. 2007) ................................................................... 15

*McCoy v. Stewart*,
   282 F.3d 626 (9th Cir. 2002)............................................................................... 13

*Metropolitan Opera Ass'n v. Local 100, Hotel Employees and Restaurant Employees Int'l Union*,
   239 F.3d 172 (2d Cir. 2001)................................................................................ 11

*Murakowski v. Univ. of Delaware*,
   575 F. Supp. 2d 571 (D. Del. 2008) ..................................................................... 15

*N. A. A. C. P. v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982)......................................................................................... 13

*Org. for a Better Austin v. Keefe*,
   402 U.S. 415 (1971).......................................................................................... 11

*Pedreira v. Sunrise Children's Servs.*,
   802 F.3d 865 (6th Cir. 2015)................................................................................. 8

*Polaris Amphitheater Concerts, Inc. v. City of Westerville*,
   267 F.3d 503 (6th Cir. 2001)........................................................................... 11, 16

*Procter & Gamble Co. v. Bankers Tr. Co.*,
  78 F.3d 219 (6th Cir. 1996).................................................................................. 12

*R.A.V. v. City of St. Paul, Minn.*,
  505 U.S. 377 (1991) ........................................................................................... 16

*Rolex Watch U.S.A., Inc. v. Crowley*,
  74 F.3d 716 (6th Cir. 1996)................................................................................... 7

*United States v. Wilson*,
  421 U.S. 309 (1975) ............................................................................................. 6

*Virginia v. Black*,
  538 U.S. 343 (2003) ...................................................................................... 14, 16

## ISSUES TO BE DECIDED

1.  Whether Defendant Richard Bengtson may be held in contempt of Court in the absence of a definite and specific Court order?

2.  Whether Defendant Richard Bengtson violated the private partial settlement agreement entered into by the parties in lieu of the Court's preliminary injunction hearing?

3.  Whether a Court order prohibiting Defendant Richard Bengtson from saying anything further on any media platform about the Barley House is an unconstitutional prior restraint?

## SUMMARY OF THE ARGUMENT

Defendant Richard Bengtson denies he violated the partial settlement agreement at issue here, but critically, he did not violate *any* Court order because this Court did not issue *any* order for Bengtson to violate.   The existence of a definite and specific court order that has been disobeyed is a necessary prerequisite to the imposition of contempt sanctions, and what is at issue here is a private agreement.  (*See* Minute Entry of Dec. 13, 2017 proceedings).  As a matter of law, Bengtson cannot be held in contempt of court for that simple reason.  While Plaintiffs may allege that Bengtson breached the partial settlement agreement, which breach Bengtson vehemently denies, this Court's "contempt power is not meant . . . *to force parties to comply with contracts, where a breach of contract action would be more appropriate*.  Rather, the contempt power is reserved for parties that knowingly violate clear and specific commands of the court."  *Gascho v. Global Fitness Holdings, LLC*, 875 F.3d 795, 801 (6th Cir. 2017) (emphasis added).  That is not the case here.  Bengtson cannot, as a matter of law, be subjected to contempt proceedings for purportedly breaching the terms of the private partial settlement agreement

entered into by the parties in lieu of the Court's preliminary injunction hearing (the "Partial Settlement Agreement"), the terms of which were never incorporated into any Court order.

But even so, Bengtson has not breached the Partial Settlement Agreement.  He has complied with both its letter and its spirit.  He addresses the listed topics in proper order, and provides context, commentary, and visual aides, which the Partial Settlement Agreement does not prohibit.  The "talking points" in the Partial Settlement Agreement were not a strict script – and the Partial Settlement Agreement reflects that fact by allowing Bengtson to use his own words to discuss the subject matter of the listed topics.  While the social media reaction of internet trolls is unfortunate, the reaction is beyond the control of Bengtson—a fact which Plaintiffs know, as they requested advance notice of the posting of the video.  As Bengtson made clear in his video, he condemns any sort of harassment, threats, or violence toward the Plaintiffs, including those purportedly resulting from his video.  And he emphatically denies taking any part in those condemnable actions.  Simply put, Plaintiffs agreed to the terms of the Partial Settlement Agreement, and Bengtson is not in violation of any of those terms.

Finally, the Court's Order prohibiting Bengtson "from saying anything further until the hearing on any media platform about the Barley House, either directly or indirectly" is a clear prior restraint and is facially unconstitutional.  Even if it is deemed moot given its expiration on January 11, 2018, the Court's contempt hearing date, if the injunction is extended thereafter in its current form, it will continue to be an unconstitutional prior restraint for the reasons stated below.

## BACKGROUND

On November 30, 2017, Plaintiffs, W.6 Restaurant Group, Ltd. and Richie Madison, filed a seven-count Verified Civil Complaint entitled *W.6 Restaurant Group, Ltd., et al. v. Richard*

*Bengtson et al.,* Cuyahoga County Court of Common Pleas Case No. CV–17–889784 (the "State Court Lawsuit").  Along with the Verified Complaint, Plaintiffs filed a Motion for a Temporary Restraining Order.

The genesis of the Lawsuit Surrounds Bengtson's visit to the Barley House on November 25, 2017 with his girlfriend (and co-defendant) Alissa Violet Butler, and her family.[1] The facts and circumstances surrounding Defendants' visit are highly disputed, but it is sufficient to state that the visit included after-hours clashes with Barley House personnel, and ended with an altercation outside the bar, which were chronicled online through various forms of social media.

Following the events of November 25, 2017, on November 29, 2017, Bengtson posted a video on YouTube explaining Defendants' version of what had transpired, which he referred to as "the worst night of our lives."[2]  Plaintiffs claim that Defendants have made false and defamatory statements and have placed them in a false light through this YouTube video and other social media outlets.  *See* Verified Complaint, ¶¶ 1, 5, 21, 23, 25-28.

Not to be outdone, Plaintiffs posted their own YouTube video,[3] which purported to detail "The Truth about Faze Banks & Alissa Violet Incident @ Barley House," using doctored and incomplete security footage and one-sided voice-over commentary containing much speculation and many unsupported and false statements.  Immediately after inserting their skewed and biased version of this highly contentious and disputed event into the public record and Internet discourse—a video which was reported on in various media outlets, including being posted in full on Cleveland.com[4]—Plaintiffs obtained the TRO in the Cuyahoga County Court of Common Pleas, silencing Defendants' ability to respond to the many false accusations and assertions in the

---

[1] When discussed collectively, Bengtson and Butler will be referred to as "Defendants."
[2] See https://www.youtube.com/watch?v=pTsjfmDaOgc
[3] See https://www.youtube.com/watch?v=fm6oG4dWSZg
[4] See http://www.cleveland.com/metro/index.ssf/2017/12/judge_orders_youtube_star_alis_1.html#incart_m-rpt-1

Barley House video.  Suffice it to say, Plaintiffs' version of the events as set forth in their video contains defamatory statements, places Defendants in a false light, and mischaracterizes the facts surrounding the events of November 25, 2017.  Plaintiffs are well aware that the Internet and social media are Defendants' primary, if not sole, means of publicity and communication (not to mention income), and their strategy was obviously to muzzle and censor any further dispute of their distorted, biased, and false version of what happened on the night in question.

Defendants removed this case to federal court and filed an emergency motion to dissolve the TRO, arguing that the TRO was an unconstitutional prior restraint on speech in blatant violation of the First Amendment.  At the preliminary injunction hearing held on December 13, 2017, the parties reached the Partial Settlement Agreement to address the TRO and Plaintiffs' request for injunctive relief.

Following this Agreement, Bengtson posted a vlog (a video weblog) on YouTube[5] captioned, "I was not allowed to upload this video..." (the "Vlog").  The Vlog tells Bengtson's side of the story that Barley House previously attempted to silence through its abuse of the judicial system, but according to the terms of the Partial Settlement Agreement; that is, the Vlog contains far less material than Bengtson would have published in the absence of the restrictions of the Partial Settlement Agreement, and had Plaintiffs not procured an unconstitutional TRO.  It is this Vlog that is the subject to current motion and proceedings.

On December 19, 2017, only hours after the Vlog was posted, counsel for Plaintiffs contacted counsel for Defendants, demanding that the Vlog be taken down, claiming that the Barley House was receiving threats.  Plaintiffs' attorney Mr. Miller was unable to provide examples of such threats despite requests by Defendants' counsel.  Nonetheless, Mr. Miller

---

[5] The Vlog had been located at  https://www.youtube.com/watch?v=kr7oKWISbHw, before the Court ordered it taken down.

insisted that the Vlog had caused a "public safety" situation; pretended that the provisions of the Partial Settlement Agreement requiring Bengtson to discourage his followers from engaging in any harassment or threats was a "weak defense" that Plaintiffs, themselves, had not demanded and that was not worth bringing before the Court; and, inexplicably, suggested that Defendants' counsel should quit or be fired.  (The relevant e-mail chains referenced above are attached, collectively, as Exhibit 1 hereto).

Rather than provide the requested examples of harassment and resolve the parties' differences privately, Plaintiffs' counsel sought to move this Court to order a takedown of the Vlog, and in the process requested leave to file said motion under seal, which prompted the Court to hold a telephone conference on December 20, 2017.  During the call, and on December 21, 2017, the Court "ordered Defendant Bengtson to take the video down immediately, and prohibited him from saying anything further until the hearing on any media platform about the Barley House, either directly or indirectly." (the "Order," Dkt. No. 18).  Bengtson complied with the Court's Order, removing the Vlog from his YouTube channel.  The Court further scheduled a "formal contempt hearing" beginning at 9:00 a.m. on January 3, 2018, which hearing was continued to January 11, 2018 at 9:00 a.m.

## ARGUMENT

**I.    Contempt Is Not an Appropriate Sanction Because Bengtson Did Not Violate Any Court Order.**

For the reasons stated in Section II, below, Bengtson did not violate the Partial Settlement Agreement.  But even if he did, contempt would not be an appropriate penalty.

The Sixth Circuit recently reiterated the already widely understood notion that "[c]ontempt is serious." *Gascho v. Global Fitness Holdings, LLC*, 875 F.3d 795, 799 (6th Cir.2017).  It explained that, "[t]o reflect its seriousness, courts must exercise the contempt

5

sanction with caution and use '[t]he least possible power adequate to the end proposed.'" *Id.* (quoting *United States v. Wilson*, 421 U.S. 309, 319 (1975)). And, "contempt is a measure of last resort, not first resort." *Id.*

To hold a litigant in contempt, there must be clear and convincing evidence that shows that the litigant "violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Electrical Workers Pension Trust Fund of Local Union No. 58 v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 379 (6th Cir. 2003). Clear and convincing evidence is, of course, "not a light burden," such as preponderance of the evidence. *Id.* If a prima facie case is established, the burden shifts to the respondent who may defend by coming forward with evidence showing the absence of a "definite and specific order" that has been disobeyed (or, where there is an order, a detailed and categorical showing that he or she is presently unable to comply with the court's order). *See Glover v. Johnson*, 138 F.3d 229, 244 (6th Cir. 1998). Normally, a court must evaluate whether the respondent took all reasonable steps within his or her power to comply with the court's order, if any, *Electrical Workers Pension*, 340 F.3d at 379, but here the Court need not engage in this analysis because there is no order at issue.

The existence of a "definite and specific order" that has been disobeyed is a necessary prerequisite to the imposition of contempt sanctions. *Glover*, 138 F.3d at 244. In this case, there is no "definite and specific order of the court requiring" Bengtson to perform or refrain from any act. Indeed, prior to December 21, 2017, apart from the unconstitutional state court TRO, there was ***no*** court order that compelled Bengtson to do or refrain from doing ***anything***. In the absence of a definite and specific order, contempt is not an available let alone an appropriate sanction, and this Court would abuse its discretion by imposing such sanctions on Bengtson. *Id.*

at 244-45 (holding that district court abused its discretion in finding defendants in contempt where there "was never a court-ordered requirement"). *Cf. Hall v. Chamberlin*, No. 4:12CV0460, 2012 U.S. Dist. LEXIS 161471, at *11 (N.D. Ohio Nov. 5, 2012) ("In order to establish a contempt, ***the charging party must prove the existence of a court order*** and show that the respondent's conduct violated its terms.") (emphasis added) (citing *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996)).

Indeed, "the contempt power is not meant . . . to force parties to comply with contracts, where a breach of contract action would be more appropriate. Rather, the contempt power is reserved for parties that knowingly violate clear and specific commands of the court." *Gascho v. Global Fitness Holdings, LLC*, 875 F.3d 795 (6th Cir. 2017) (citing, among other authorities, *Hall v. Chamberlin*, No. 4:12CV0460, 2012 U.S. Dist. LEXIS 161471, at *11 (N.D. Ohio Nov. 5, 2012) (rejecting a contempt motion where settlement agreement was contingent, and the contingencies had not yet occurred)). At most, Bengtson merely breached the Partial Settlement Agreement, although Bengtson vehemently denies that he engaged in any breach for the reasons stated below. The Partial Settlement Agreement is not a Court order, it does not appear on the electronic docket, and would not be in the record on appeal unless Plaintiffs or Defendants file the Agreement with the Court of Appeals.

While the Partial Settlement Agreement provides that this Court retains jurisdiction to enforce the terms and conditions thereof, that does not give the Court the power to enforce it through contempt proceedings—especially since the Court did not incorporate the terms of the Partial Settlement Agreement into any order. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380, (1994) (holding that a district court lacks jurisdiction to enforce a settlement agreement where the parties' obligation to comply with the terms of the agreement had not been

7

made part of the order of dismissal ); *see also Christina A. v. Bloomberg*, 315 F.3d 990, 993 (8th Cir. 2003) ("the district court's enforcement jurisdiction alone is not enough to establish a judicial '*imprimatur*' on the settlement contract"); *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 460 (7th Cir. 1993) ("Standing alone, a settlement agreement is nothing more than a contract; the imprimatur of an injunction is required to render it a consent decree enforceable through contempt."). Put differently, the Partial Settlement Agreement is not a consent decree— it is a private contract governed and enforced by contract law principles. *See Pedreira v. Sunrise Children's Servs.*, 802 F.3d 865, 871 (6th Cir. 2015) (distinguishing private settlements from consent decrees). And "the parties to a private settlement typically must bring another suit (for breach of contract) to enforce it." *Id.* (citing *Kokkonen*, 511 U.S. at 381-82).

Accordingly, Ohio contract law governs whether the Partial Settlement Agreement was breached and if so, what Plaintiffs' remedy is, and as the Sixth Circuit recently cautioned, this Court's inherent contempt power is not "meant to force parties to comply with contracts, where a breach of contract action would be more appropriate." *Gascho v. Global Fitness Holdings, LLC*, 875 F.3d 795, 801 (6th Cir. 2017). Such is the case here, and this Court would abuse its discretion by using its inherent contempt powers to remedy any purported breach of the Partial Settlement Agreement.

## II.     Bengtson Did Not Violate the Partial Settlement Agreement.

A review of the Vlog demonstrates that there is no violation of the Partial Settlement Agreement to warrant any penalty, let alone a contempt citation. The Vlog follows the Partial Settlement Agreement in letter and spirit, as the Court can see simply by watching the video and comparing it to the Partial Settlement Agreement. For the sake of convenience and ease of reference, Bengtson attaches hereto as Exhibit 2, a spreadsheet matching the language in the Vlog (which was transcribed by a court reporter, the full transcript of which is attached hereto as

Exhibit 3) to the corresponding provision of the Partial Settlement Agreement.  Of paramount importance is that Bengtson states in the Vlog that the purpose of the post was to tell his side of the story and to put the dispute to rest at least in the public eye, to allow for a private resolution of all remaining claims, and to discourage any further harassment or threats toward Plaintiffs and express his condemnation for same.  That the public did not consider the matter closed or heed his words is not Bengtson's fault.

In his own words, and with context and visual aides not prohibited by the Partial Settlement Agreement, Bengtson explained that he did not start any physical altercation; Defendants were not escorted to their car; Defendants paid their bar tab which totaled a sum certain including tips; Butler's mother did not apologize; Bengtson was involved in a fight outside because he was defending Butler, but the person he was involved in the fight with was not involved with Barley House.  Also, as agreed, Bengtson acknowledged where he personally went wrong the night of November 25, 2017.  The context and background included in the Vlog provides insight to Bengtson's statements; the Partial Settlement Agreement does not prohibit this, but rather, specifically states that Bengtson can express the subject matter of the listed points in his own words.  The point of the Partial Settlement Agreement was to allow Bengtson to tell his side of the story and salvage his professional reputation, and it does not purport to be a script; it does not prohibit Bengtson from becoming emotional, heated, or angry about the events of November 25, 2017; it does not prohibit him from repeating himself or emphasizing certain points; and it does not prohibit him from using graphics or from reviewing the Barley House security footage in connection with the agreed-upon points.

Moreover, the alleged threats purportedly resulting from the Vlog simply did not come from Bengtson, but rather third parties outside of his control, and he specifically condemned any

9

such behavior.[6]  The Vlog in question makes this point abundantly clear.  Bengtson pointedly stated, multiple times in the Vlog, that he does not condone harassment, did not seek to re-ignite this dispute, that he wanted to end the dispute, that it was hereafter a private matter, that he did not condone any negativity, and that his fans should let it be, and that it was not acceptable to harass, intimidate, or threaten Plaintiffs.  These warnings bookended the Vlog at the beginning and end as agreed.  Bengtson also requested that his fans stop online harassment or any other harassment of the Barley House, Madison or their employees and asked that the Vlog be considered the end of the online discussion concerning the events of November 25, 2017.

Despite Bengtson taking reasonable measures to prevent hostile reactions to the Vlog as required by the Partial Settlement Agreement, such reactions have allegedly occurred.  Bengtson cannot be found guilty by association in these circumstances, as he did not agree to be penalized for others' wrongdoing; rather, he agreed to take certain measures, and did so, and it stands to reason that each and every one of four million followers could not necessarily be controlled even by way of reasonable precautions.  A negative social media reaction was a risk Plaintiffs took in agreeing to the Partial Settlement Agreement—a risk which Plaintiffs even planned for by requesting advance notice of the posting of the Vlog.  That they regret the outcome is not a reason to find Bengtson in breach of contract.  To expect one person to dictate the actions and reactions of the entire Internet community is patently unreasonable and not what was intended by the Partial Settlement Agreement.

---

[6] And, as noted above, despite several requests, Plaintiffs and their counsel have refused to provide any documentation or examples of the alleged threats posed to Plaintiffs.

III.    **The Order Contains an Unconstitutional Prior Restraint in Violation of the First Amendment.**

A.    <u>**Bengtson's Protected Speech Is Unlawfully Curtailed by the Order.**</u>

The Court's Order prohibiting Bengtson "from saying anything further until the hearing on any media platform about the Barley House, either directly or indirectly" is a clear prior restraint—*i.e.*, a judicial order that blocks expressive activity before it can occur—and is facially unconstitutional.  *See Polaris Amphitheater Concerts, Inc. v. City of Westerville,* 267 F.3d 503, 506 (6th Cir. 2001) (citing *Alexander v. United States,* 509 U.S. 544, 550 (1993)). "Temporary restraining orders and permanent injunctions—*i.e.,* court orders that actually forbid speech activities—are classic examples of prior restraints." *Alexander,* 509 U.S. at 550.  *See also Polaris Amphitheater,* 267 F.3d at 507 ("Injunctions are indeed at the 'core of the prior restraint doctrine.'"). Even if it is deemed moot given its expiration on January 3, 2018, the Court's contempt hearing date, if the injunction is extended thereafter in its current form, it will continue to be an unconstitutional prior restraint for the reasons stated below.

"Any prior restraint on expression comes . . . with a 'heavy presumption' against its constitutional validity." *Org. for a Better Austin v. Keefe,* 402 U.S. 415, 419 (1971).  *See also County Security Agency v. Ohio Dep't of Commerce,* 296 F.3d 477, 485 (6th Cir. 2002). "Indeed, prior restraints are 'the most serious and the least tolerable infringement on First Amendment rights.'" *Metropolitan Opera Ass'n v. Local 100, Hotel Employees and Restaurant Employees Int'l Union,* 239 F.3d 172, 176 (2d Cir. 2001).  What is worse, "when a prior restraint takes the form of a court-issued injunction, the risk of infringing on speech protected under the First Amendment increases.  An injunction must be obeyed until modified or dissolved, and its unconstitutionality is no defense to disobedience . . . ." *Id.* at 176 (citations omitted).

11

The Court's expansive gag order flies in the face of the First Amendment and is manifestly unjust given the factual circumstances.  As a threshold matter, it is a content-based restriction on speech that the Supreme Court has consistently held to be subject to strict scrutiny and illegitimate unless the restriction is narrowly tailored to address a compelling state interest. *See, e.g., Boos v. Barry*, 485 U.S. 312, 320 (1988).  But in the context of a prior restraint "the hurdle is substantially higher: publication must threaten an interest more fundamental than the First Amendment itself.  Indeed, the Supreme Court has never upheld a prior restraint, even faced with the competing interest of national security or the Sixth Amendment right to a fair trial." *Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226-27 (6th Cir. 1996), *opinion clarified* (May 8, 1996).  Even in such rare situations where a prior restraint may be permissible, the restraint must be narrowly drawn and be the least restrictive means available. *See CBS Inc. v. Young*, 522 F.2d 234, 236, 238, 239-40 (6th Cir.1975) (holding that an order prohibiting counsel, court personnel, parties, and parties' relatives, friends, and associates from discussing "in any manner whatsoever" the personal injury and wrongful death cases before the court was an invalid prior restraint because, among other reasons, of its "vagueness and overbreadth").  The Order is far too broad to be considered narrowly tailored, *see id.*, and there is no compelling government interest that outweighs Bengtson's First Amendment interests, especially considering the heightened standard for prior restraints.

Despite the conclusory allegations in Plaintiffs' papers and their baseless speculation, as discussed above, any threats or "trolling" against them on the Internet either did not come from Bengtson or anyone under his control, or were otherwise not outside the ambit of the First Amendment.  Liability for statements by third parties—*i.e.*, the alleged threats and purportedly harassing statements Plaintiffs claim that third parties are directing to Barley House—cannot be

12

attributed to Bengtson.  One can only be held liable for the torts of others if "he authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity"; he "incite[d] lawless action"; or he "gave other specific instructions to carry out violent acts or threats."  *N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982).  None of these circumstances is present here; as discussed above, the Vlog explicitly did the exact opposite of these things.  *See In re White*, No. 2:07CV342, 2013 WL 5295652, at *38 (E.D. Va. Sept. 13, 2013) (Internet postings protected by First Amendment unless they fall within categorical exclusions to free speech).

There is no unlawful incitement here because Bengtson did not make any statements that would produce "imminent lawless action" and that would have been "likely to incite or produce such action."  *Brandenburg v. Ohio*, 395 U.S. 444 (1969); *Hess v. Indiana*, 414 U.S. 105, 108 (1973) (requiring evidence that the speaker "intended" his words to produce violent conduct under the Brandenburg test).  Just the opposite.  The Vlog includes a number of affirmative instructions, pleas, and requests *not* to harass, threaten, or otherwise interfere with Plaintiffs.  As contemplated by the Partial Settlement Agreement, those statements bookend the beginning and end of the Vlog, and nothing in the rest of the Vlog can plausibly be said to incite lawless action, or even authorize, direct, ratify, or instruct such action.

Regardless, even if Bengtson's statements did not have their intended effect, "[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it absent some showing of a direct connection between the speech and imminent illegal conduct."  *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002); *McCoy v. Stewart*, 282 F.3d 626, 631 (9th Cir.2002) (holding that incitement is not imminent if it risks third-party violence at some "indefinite future time").  *See also In re White*, 2013 WL 5295652, at *39-40 ("Describing this

13

rigorous [incitement] standard, the Magistrate Judge concluded that the evidence was "simply . . . insufficient" to show that any of White's postings met "the imminency requirement of Brandenburg."); *id.* at 40 ("[T]here [wa]s nothing concrete by which the Court could conclude that [such Internet] postings have led to any acts of violence or harm to others.") (internal citations and quotation marks omitted).  As mentioned above, here, the threatening or harassing statements at issue are attributable to third parties, and the statements made by Bengtson in the Vlog are in no way directing anyone to commit an unlawful act, let alone an imminent or likely one, and in fact are instructing viewers to refrain from any unlawful acts.  Similarly, to the extent Plaintiffs still believe the statements made by Bengtson as shown in Exhibit A to the Complaint are unlawful, that theory is misguided, as those statements did not constitute incitement for the reasons stated above, and in Defendants' motion to dissolve the TRO.

Bengtson also did not make any "true threat," as that term has been defined by the courts, *i.e.*, "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). A plain viewing of the Vlog shows that no such statements are present.  As to the two statements made by Bengtson as shown in Exhibit A to the Complaint, they are either vague and indirect (a "comment" online purportedly directed to Mr. Madison stating, "You're fucked"), or are not directed to Plaintiffs at all (a statement posted on Bengtson's own social media account, "I will kill you").  *See In re White*, 2013 WL 5295652, at *39 ("Specifically, the Magistrate Judge found that there was 'no evidence before the Court that White communicated any threats directly to Mottley,' a fact that distinguished this case from 'virtually all cases of which the Court [wa]s aware on this topic,' in which 'the accused's statements were directly or indirectly tied to a threat of harm to one or more victims.'").

The fact that such speech is made between computer users geographically distant and separated by screens and servers also significantly weighs against a prior restraint based on an alleged true threat. *See id.* at \*40 (holding "that the wide availability of White's writings on the Internet made them less likely to constitute a true threat than communication delivered directly to the target."). *See also Burge ex rel. Burge v. Colton Sch. Dist. 53*, 100 F. Supp. 3d 1057 (D. Or. 2015) (student's comments about teacher on social media site, including that "she needs to be shot," did not present a true threat excepted from First Amendment protection; student did not subjectively intend to threaten or intimidate teacher or any other person but only to express his dissatisfaction with his grade and elicit response from his friends). It is critical to analyze "the statements in their context" because "a totality of the circumstances review examining" the postings at issue "beyond the statements in isolation" show that they do not represent "serious expression of intent to inflict harm." *Murakowski v. Univ. of Delaware*, 575 F. Supp. 2d 571, 590 (D. Del. 2008) (finding extremely graphic and disturbing website posts not "true threats" when viewed in context).

For largely the same reasons stated above, none of the statements at issue (either in the Vlog or as set forth in Exhibit A to the Complaint) constitutes "fighting words" – *i.e.*, "those by which their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). *See also Layshock v. Hermitage Sch. Dist.*, 496 F. Supp. 2d 587, 602–03 (W.D. Pa. 2007) ("Defendants claim that Justin's speech constituted 'fighting words.' This argument is without merit. A 'MySpace' internet page is not outside of the protections of the First Amendment under the fighting words doctrine because there is simply no in-person confrontation in cyberspace such that physical violence is likely to be instigated."). Even so, while "nonspeech" elements of fighting words are not protected, the

underlying message still is, and any government regulation must still be content-neutral, *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 386 (1991), which is not the case here for the reasons stated above.

**B.    Bengtson's and the Public's Interest Will Be Significantly Harmed if the Injunctive Aspect of the Order Is Allowed to Stand or Continue.**

The issuance of the injunctive aspect of the Order causes irreparable harm to Bengtson because it deprives him of his First Amendment rights which, while Constitutionally fundamental in American democracy, also form the basis of Bengtson's entire livelihood. The Supreme Court has held that "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns,* 427 U.S. 347, 373 (1976), which is even more significant here given that Mr. Bengtson makes his living through social media posting, including expressive speech and creative content, about life events—the events of November 25, 2017, and this case being chief among them presently.   Similarly, the Sixth Circuit has stated that "[e]ven minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief," and the infringement here is far beyond minimal—it is absolute.  *G & V Lounge Inc. v. Michigan Liquor Control Comm'n,* 23 F.3d 1071, 1078 (6th Cir. 1994).   The Sixth Circuit has "invalidated laws that prohibit future expressive activity in retaliation for past unlawful conduct,"[7] which is precisely what the Order purports to do here.  *Polaris,* 267 F.3d at 507.  *See also City of Paducah v. Investment Entertainment*, 791 F.2d 463, 470 (6th Cir.1986).  The Order is an unconstitutional prior restraint of speech that will harm Bengtson's livelihood and his basic constitutional rights if allowed to stand or continue.

Finally, because the Order deprives Bengtson of his First Amendment rights, it creates harm to the public as well.  The Sixth Circuit has stated that "it is always in the public interest to

---

[7] Defendants do not concede that they engaged in any unlawful conduct.

prevent the violation of a party's constitutional rights." *G & V Lounge, Inc.*, 56 F.3d at 1079. Further, "the public as a whole has a significant interest in ensuring equal protection of the laws and protection of First Amendment liberties." *Dayton Area Visually Impaired Persons, Inc. v. Fisher,* 70 F.3d 1474, 1490 (6th Cir. 1995).

## <u>CONCLUSION</u>

For the reasons stated above, the Court should not hold Bengtson in contempt or in breach of the Partial Settlement Agreement.

Respectfully submitted,

/s/ David M. Cuppage
Robert T. Glickman (0059579)
David M. Cuppage (0047104)
Nicholas R. Oleski (0095808)
MCCARTHY, LEBIT, CRYSTAL
 & LIFFMAN CO., LPA
101 West Prospect Avenue
1800 Midland Building
Cleveland, Ohio 44115
(216) 696-1422 – Telephone
(216) 696-1210 – Facsimile
rtg@mccarthylebit.com
dmc@mccarthylebit.com
nro@mccarthylebit.com

*Attorneys for Defendants*


/s/Scott J. Sholder
Scott J. Sholder (*pro hac vice*)
COWAN, DEBAETS, ABRAHAMS &
 SHEPPARD, LLP
41 Madison Avenue, 38th Floor
New York, New York 10010
(212) 974-7474 – Telephone
(212) 974-8474 – Facsimile
ssholder@cdas.com

*Attorneys for Defendants*

17

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(f), I hereby certify that the foregoing Memorandum complies with the 20-page limitation for memoranda relating to a dispositive motion in a case assigned to the Standard Track.

*/s/ David M. Cuppage*
David M. Cuppage
*One of the Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The foregoing was electronically filed this 29th day of December 2017.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ David M. Cuppage*
David M. Cuppage
*One of the Attorneys for Defendants*

18