UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| W.6 Restaurant Group Ltd., d/b/a The Barley House of Cleveland, et al. | ) ) ) | CASE NO.: 1:17-cv-02521 |
| | ) | JUDGE DAN AARON POLSTER |
| Plaintiffs, | ) ) | **ANSWER AND COUNTERCLAIMS** |
| v. | ) ) | **Jury Trial Demanded** |
| Richard Bengtson, et al. | ) ) | |
| Defendants | ) ) ) | |

| | | |
|---|---|---|
| Richard Bengtson and Alissa Violet Butler, | ) ) | |
| Counterclaim Plaintiffs, | ) ) | |
| v. | ) ) | |
| W.6 Restaurant Group Ltd., d/b/a The Barley House of Cleveland, Richie Madison, Robert George, Corey May, John Vasko, John Doe 1, and Jane Does 1 & 2 | ) ) ) ) ) | |
| Counterclaim Defendants. | ) | |

Defendants/Counterclaimant Plaintiffs, Richard Bengtson and Alissa Violet Butler, by and through undersigned counsel, hereby submit their answer to the Verified Complaint filed by Plaintiffs W.6 Restaurant Group, Ltd. ("W.6", and sometimes referred to as "Barley House"), and Richie Madison (collectively "Plaintiffs").

## ANSWER

Defendants Richard Bengtson and Alissa Violate Butler (collectively, "Defendants"), for their answer, state as follows:

## Introduction

1. Defendants Richard Bengtson and Alissa Violate Butler (collectively, "Defendants") deny the allegations in paragraph 1 of the Verified Complaint.

2. Defendants deny the allegations in paragraph 2 of the Verified Complaint but admit that Bengtson goes by the names "Ricky Banks" and "FaZe Banks" in his social media profiles.

3. Defendants deny the allegations in paragraph 3 of the Verified Complaint but admit that Butler goes by the name "Alissa Violet" in her social media profiles.

4. Defendants admit the allegations in paragraph 4 of the Verified Complaint.

5. Defendants deny the allegations in paragraph 5 of the Verified Complaint.

## The Parties and Jurisdiction

6. Defendants deny knowledge or information sufficient to form a belief concerning the truth or falsity of the allegations in paragraph 6 of the Verified Complaint, and therefore deny same.

7. Defendants deny knowledge or information sufficient to form a belief concerning the truth or falsity of the allegations in paragraph 7 of the Verified Complaint, and therefore deny same.

8. Defendants admit the allegations in paragraph 8 of the Verified Complaint.

9. Defendants deny the allegations in paragraph 9 of the Verified Complaint.

10. Defendants state that paragraph 10 of the Verified Complaint consists of legal conclusions to which no response is required. To the extent any response is required, Defendants admit that the events giving rise to the complaint occurred in Cuyahoga County, Ohio.

11.     Defendants state that paragraph 11 of the Verified Complaint consists of legal conclusions to which no response is required, and that this paragraph is no longer relevant in light of Defendants' removal to federal court.

12.     Defendants state that paragraph 12 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

### Facts Common to All Claims

13.     Defendants incorporate the foregoing admissions and denials as if fully rewritten herein.

14.     Defendants admit the allegations in paragraph 14 of the Verified Complaint.

15.     Defendants deny the allegations in paragraph 15 of the Verified Complaint except admit Defendants were on Barley House property after normal business hours, and state that their presence at that time was permitted by Plaintiffs.

16.     Defendants deny the allegations in paragraph 16 of the Verified Complaint

17.     Defendants deny the allegations in paragraph 17 of the Verified Complaint, and state that to the extent Bengtson engaged in any physical contact with plaintiff Madison, such contact was in self-defense in response to the assault and battery initiated by Madison.

18.     Defendants deny the allegations in paragraph 18 of the Verified Complaint, but state that Defendants remained outside of Barley House for the purpose of finding someone at Barley House to talk to about how they were mistreated throughout the night, and that any altercations thereafter were instigated by favored patrons of Barley House.

3

19.     Defendants deny the allegations in paragraph 19 of the Verified Complaint, but state that Defendants were assaulted and battered by at least three Barley House patrons outside Barley House after normal business hours.

20.     Defendants deny the allegations in paragraph 20 of the Verified Complaint, and therefore deny same.

21.     Defendants deny the allegations in paragraph 21 of the Verified Complaint.

22.     Defendants deny the allegations in paragraph 22 of the Verified Complaint but admit that Bengtson and Butler have millions of followers across various social media platforms.

23.     Defendants state that paragraph 23 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

24.     Defendants state that paragraph 24 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

25.     Defendants deny the allegations in paragraph 25 of the Verified Complaint.

26.     Defendants deny the allegations in paragraph 26 of the Verified Complaint.

27.     Defendants deny the allegations in paragraph 27 of the Verified Complaint.

28.     Defendants deny the allegations in paragraph 28 of the Verified Complaint.

## Count I (Defamation)

29.     Defendants incorporate the foregoing allegations as if fully rewritten herein.

30.     Defendants state that paragraph 30 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

31.     Defendants deny the allegations in paragraph 31 of the Verified Complaint

32.     Defendants deny knowledge or information sufficient to form a belief concerning the truth or falsity of the allegations in paragraph 32 of the Verified Complaint, and therefore deny same.

33.     Defendants deny knowledge or information sufficient to form a belief concerning the truth or falsity of the allegations in paragraph 33 of the Verified Complaint, and therefore deny same.

34.     Defendants state that the contents of the referenced video speak for themselves, but deny that such statements were false or that the video was "directed at Barley House." Defendants deny the remaining allegations of paragraph 34 of the Verified Complaint.

35.     Defendants state that the contents of the referenced video speak for themselves, but deny that such statements were false or that the video was "directed at Barley House." Defendants deny the remaining allegations of paragraph 35 of the Verified Complaint

36.     Defendants deny knowledge or information sufficient to form a belief concerning the truth or falsity of the allegations in paragraph 36 of the Verified Complaint, and therefore deny same.

37.     Defendants deny the allegations in paragraph 37 of the Verified Complaint.

38.     Defendants state that paragraph 38 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

39.     Defendants state that paragraph 39 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

40.     Defendants deny the allegations in paragraph 40 of the Verified Complaint.

41.     Defendants deny the allegations in paragraph 41 of the Verified Complaint.

42.     Defendants deny the allegations in paragraph 42 of the Verified Complaint but admit that they published certain statements about the events at the Barley House on social media.

43.     Defendants state that paragraph 43 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

44.     Defendants state that paragraph 44 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

### Count II (False Light)

45.     Defendants incorporate the foregoing allegations as if fully rewritten herein.

46.     Defendants state that paragraph 46 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

47.     Defendants state that paragraph 47 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

48.     Defendants state that paragraph 48 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

49.  Defendants state that paragraph 49 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

### Count III (Intrusion Upon Seclusion)

50.  Defendants incorporate the foregoing allegations as if fully rewritten herein.

51.  Defendants state that paragraph 51 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

52.  Defendants state that paragraph 52 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

53.  Defendants state that paragraph 53 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

### Count IV (Tortious Interference with Business Relations)

54.  Defendants incorporate the foregoing allegations as if fully rewritten herein.

55.  Defendants state that paragraph 55 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

56.  Defendants deny knowledge or information sufficient to form a belief concerning the truth or falsity of the allegations in paragraph 56 of the Verified Complaint, and therefore deny same.

57.     Defendants deny knowledge or information sufficient to form a belief concerning the truth or falsity of the allegations in paragraph 57 of the Verified Complaint, and therefore deny same.

58.     Defendants deny the allegations in paragraph 58 of the Verified Complaint.

59.     Defendants deny the allegations in paragraph 59 of the Verified Complaint.

60.     Defendants state that paragraph 60 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

61.     Defendants state that paragraph 61 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

## Count V (Intentional Infliction of Emotional Distress)

62.     Defendants incorporate the foregoing allegations as if fully rewritten herein.

63.     Defendants state that paragraph 63 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

64.     Defendants state that paragraph 64 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

65.     Defendants deny knowledge or information sufficient to form a belief concerning the truth or falsity of the allegations in paragraph 65 of the Verified Complaint, and therefore deny same.

66.     Defendants state that paragraph 66 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny knowledge or information sufficient to form a belief concerning the truth or falsity of the allegations in this paragraph, and therefore deny same.

67.     Defendants state that paragraph 67 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny knowledge or information sufficient to form a belief concerning the truth or falsity of the allegations in this paragraph, and therefore deny same.

### Count VI (Battery)

68.     Defendants incorporate the foregoing allegations as if fully rewritten herein.

69.     Defendants state that paragraph 69 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph, and state that Madison assaulted and battered Bengtson, and to the extent Bengtson made any physical contact with Madison, such contact was in self-defense.

70.     Defendants state that paragraph 70 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

71.     Defendants state that paragraph 71 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny knowledge or information sufficient to form a belief concerning the truth or falsity of the allegations in this paragraph, and therefore deny same.

72.     Defendants state that paragraph 72 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

73.     Defendants deny knowledge or information sufficient to form a belief concerning the truth or falsity of the allegations in paragraph 73 of the Verified Complaint, and therefore deny same.

**Count VII (Assault)**

74.     Defendants incorporate the foregoing allegations as if fully rewritten herein.

75.     Defendants state that paragraph 75 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny knowledge or information sufficient to form a belief concerning the truth or falsity of the allegations in this paragraph, and therefore deny same.

76.     Defendants state that paragraph 76 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

77.     Defendants deny knowledge or information sufficient to form a belief concerning the truth or falsity of the allegations in paragraph 77 of the Verified Complaint, and therefore deny same.

78.     Defendants state that paragraph 78 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

79. Defendants deny knowledge or information sufficient to form a belief concerning the truth or falsity of the allegations in paragraph 79 of the Verified Complaint, and therefore deny same.

### Count VIII (Preliminary and Permanent Injunction)

80. Defendants incorporate the foregoing allegations as if fully rewritten herein.

81. Defendants state that paragraph 81 of the Verified Complaint consists of legal conclusions to which no response is required. To the extent any response is required, deny knowledge or information sufficient to form a belief concerning the truth or falsity of the allegations in this paragraph, and therefore deny same.

82. Defendants deny the allegations in paragraph 82 of the Verified Complaint.

83. Defendants state that paragraph 83 of the Verified Complaint consists of legal conclusions to which no response is required. To the extent any response is required, deny the allegations in this paragraph.

84. Defendants state that paragraph 84 of the Verified Complaint consists of legal conclusions to which no response is required. To the extent any response is required, deny the allegations in this paragraph.

85. Defendants state that paragraph 85 of the Verified Complaint consists of legal conclusions to which no response is required. To the extent any response is required, deny the allegations in this paragraph.

86. Defendants state that paragraph 86 of the Verified Complaint consists of legal conclusions to which no response is required. To the extent any response is required, deny the allegations in this paragraph, and deny that Plaintiffs are entitled to any of the requested relief.

87.     Defendants state that paragraph 87 of the Verified Complaint consists of legal conclusions to which no response is required.  To the extent any response is required, deny the allegations in this paragraph.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Plaintiffs fail to state a claim upon which relief could be granted.

### Second Affirmative Defense

Plaintiffs' claims are barred because Defendants did not make any legally defamatory statements or statements that would invade a right of privacy in that their statements were either true or based on opinion.

### Third Affirmative Defense

Plaintiffs' claims are barred because Defendants did not act with actual malice (as to defamation or false light).

### Fourth Affirmative Defense

Plaintiffs' claims are barred because Defendants did not intrude upon any seclusion given that the Barley House is a public establishment and all events occurred either in this public establishment, outside on the public street, or on the Internet.

### Fifth Affirmative Defense

Plaintiffs' claims are barred because Defendants did not engage in extreme or outrageous behavior so as to justify the tort of intentional infliction of emotional distress.

### Sixth Affirmative Defense

Defendant Bengtson did not commit battery, but rather was acting in self-defense, and Plaintiffs' assault claims fail in that they are based on speech and actions of third parties.

12

### Seventh Affirmative Defense

Plaintiffs' claims are barred because Defendants did not tortuously interfere with Plaintiffs' business because any alleged "interference" was not wrongful, and was in fact justified and privileged in light of Plaintiffs' mistreatment and abuse of Defendants.

### Eighth Affirmative Defense

Plaintiffs' claims are barred because of Defendants' right of free speech to criticize or even boycott an establishment for mistreatment and abuse.

### Ninth Affirmative Defense

Plaintiffs' claims are barred because Defendants acted at all times with privilege to make the statements they made.

### Tenth Affirmative Defense

"Preliminary and Permanent Injunction" is a remedy, not a cause of action.

### Eleventh Affirmative Defense

Plaintiffs come to the Court with unclean hands given their own unlawful acts as described in Defendants' counterclaims, especially their procurement of an unconstitutional TRO specifically aimed at muzzling Defendants in the face of defamatory statements about Defendants Plaintiffs knew Defendants would be unable to respond to.

### Twelfth Affirmative Defense

Plaintiffs have suffered no cognizable injury, especially given that they have used this incident as a publicity stunt, for example, by disseminating paid advertisements for their bar featuring their defamatory video commentary on the Barley House altercations.

13

## Fourteenth Affirmative Defense

Defendants were not the cause of any of Plaintiffs' alleged injuries to the extent any injuries were suffered; rather, there were superseding or intervening causes, including conduct by third-party Internet trolls and other users whom Defendants do not control and with whom Defendants are not affiliated.

## Fifteenth Affirmative Defense

Plaintiffs' alleged harm was of their own making given that the altercations – and online commentary about the altercations – giving rise to this lawsuit were the fault of Plaintiffs and other parties affiliated with Plaintiffs as discussed in detail below in the Defendants' counterclaims.

## COUNTERCLAIMS

Defendants/Counterclaim Plaintiffs Richard Bengtson and Alissa Violet Butler (collectively, "Counterclaim Plaintiffs"), by and through undersigned counsel, hereby state as their counterclaims against Plaintiffs/Counterclaim Defendants W.6 Restaurant Group, Ltd. d/b/a The Barley House of Cleveland, and Richie Madison (collectively, "Counterclaim Defendants"), and state for their claims against  Defendants Robert George, Corey May, John Vasko, John Doe 1, and Jane Does 1 and 2 (collectively, "Third Party Defendants"), as follows:

## PARTIES

1.      Defendant/Counterclaim Plaintiff Richard Bengtson is a natural person domiciled and residing in the State of California.

2.      Mr. Bengtson is a social media personality and influencer whose job it is to post audiovisual content on various social media platforms such as YouTube, Twitter, and Snapchat. Mr. Bengtson's content is primarily an online journal based on documenting his life in as honest,

14

transparent, and genuine a manner as possible, unlike many other YouTube celebrities who create fictional characters that are not necessarily true to who they are "in real life."

3. Mr. Bengtson makes his living by regularly posting original content on these various social media platforms, and YouTube in particular. Specifically, he is paid through advertising revenue earned on each of his videos, and sponsorships of products or services he promotes in his videos. Mr. Bengtson also earns money through sales of merchandise associated with his brands.

4. In order to maintain a fan base and viewership (and ultimately earn a living), Mr. Bengtson must post videos regularly and must respond to postings about him in real time. Fans disengage when Mr. Bengtson cannot create new content, particularly content that responds to negative statements from third parties, as is common in the world of often-feuding social media personalities.

5. Defendant/Counterclaim Plaintiff Alissa Violet Butler is a natural person domiciled and residing in the state of California.

6. Ms. Butler grew up in Cleveland, Ohio, but moved to California in 2015, and currently lives with Mr. Bengtson, her boyfriend. She lives in California permanently and has no intention of moving back to Ohio.

7. Ms. Butler is also a social media personality and influencer whose job it is to post audiovisual content on various social media platforms such as YouTube, Twitter, and Snapchat. Like Mr. Bengtson, Ms. Butler's content is primarily an online journal based on documenting her life in as honest, transparent, and genuine a manner as possible, unlike many other YouTube celebrities who create fictional characters that are not necessarily true to who they are "in real life."

15

8. Ms. Butler also makes her living by regularly posting original content on these various social media platforms, and YouTube in particular. Specifically, she is paid through advertising revenue earned on each of her videos, and sponsorships of products or services she promotes in her videos.

9. In order to maintain a fan base and viewership (and ultimately earn a living), Ms. Butler must post videos regularly and must respond to postings about her in real time. Fans disengage when Ms. Butler cannot create new content, particularly content that responds to negative statements from third parties, as is common in the world of often-feuding social media personalities.

10. W.6 Restaurant Group, Ltd., alleges that it is an Ohio limited liability company which owns and operates The Barley House Cleveland, a restaurant and bar located at 1261 W 6th St, Cleveland OH 44113.

11. Richie Madison is a natural person allegedly domiciled and residing at 1676 Lewis Drive, Lakewood, OH 44107, and at all relevant times has worked and does work as a bouncer at Barley House.

12. Robert George is a natural person domiciled and residing in the state of Ohio, and at all relevant times has been and is an owner of W.6 and/or Barley House.

13. On information and belief, John Vasko is a natural person domiciled and residing in the state of Ohio, and at all relevant times has been and is a patron of Barley House.

14. On information and belief, Corey May is a natural person domiciled and residing in the state of Ohio, and at all relevant times has worked and does work as a manager at Barley House.

15. On information and belief, John Doe 1 and Jane Does 1 and 2 are natural persons domiciled and residing in the state of Ohio. John Doe 1 is believed to be an employee of Barley House, and Jane Does 1 and 2 are believed to be patrons of Barley House. Counterclaim Plaintiffs do not know the true names and capacities of the Defendants sued in this Counterclaim as John Doe 1 and Jane Does 1 and 2, and therefore sue these Defendants by fictitious names. Counterclaim Plaintiffs will amend this Counterclaim to allege the true names and capacities of these Doe Defendants when ascertained.

## JURISDICTION

16. This Court has subject matter jurisdiction over these counterclaims under 28 U.S.C. 1332(a) because there is complete diversity between the Counterclaim Plaintiffs and Counterclaim Defendants, and the amount in controversy exceeds $75,000.

17. Specifically, both Counterclaim Plaintiffs are domiciled and reside in California, and all Counterclaim Defendants, if individuals, are domiciled in Ohio, and if corporations, are incorporated in, and/or have their principal places of business in, Ohio.

18. Moreover, each of the Counterclaim Plaintiffs has been damaged in amounts far exceeding the $75,000 jurisdictional threshold, as discussed further, below.

19. The Court has personal jurisdiction over W.6 Restaurant Group, Ltd., as it is incorporated in this District and has its principal place of business here.

20. The Court has personal jurisdiction over Richie Madison, Robert George, John Vasko, and Corey May, because, on information and belief, they are domiciled and reside in this District.

21. On information and belief, the Court has personal jurisdiction over John Doe 1 and Jane Does 1 and 2, as they are domiciled and reside in this District.

22. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because, on information and belief, all Counterclaim Defendants are residents of Ohio, and because the events giving rise to the claims herein occurred in Ohio.

## FACTS

### *Barley House Altercations on the Night of November 25, 2017*

23. Mr. Bengtson and Ms. Butler traveled to Cleveland, Ohio to visit Mr. Butler's family for the Thanksgiving holiday. It was the first time Mr. Bengtson was going to meet his girlfriend's family.

24. As part of the festivities, the family and a few of Ms. Butler's friends went to the Barley House on Saturday November 25, 2017, a bar and restaurant which is located approximately 30-40 minutes by car from Ms. Butler's family's home.

25. The location was chosen because Ms. Butler's friend Maria Rose Roush (who was present on the night in question) is an employee of a sister restaurant of Barley House, and was able to get the large group into the restaurant, and also arranged for discounts on food and drink.

26. Ms. Butler and her family and Mr. Bengtson ate dinner at the Barley House, and stayed until closing, at around 2:30 a.m.

27. The night was largely uneventful; everyone had a good time, got along with the staff, enjoyed their food and drink, and Mr. Bengtson showed his appreciation to the Barley House staff by generously tipping in cash throughout the evening.

28. Mr. Bengtson, mindful of impressing his girlfriend's family and friends, and aware he was out of his comfort zone in an unfamiliar city without any of his own friends, was particularly interested in ensuring the night was relaxing, pleasant, and uneventful. He only had two or three drinks throughout the course of the night, and was not intoxicated at any point.

18

29.     Mr. Bengtson and his party spent a total of approximately $1,000 including food, drink, gratuity, and cash tips throughout the night to various Barley House staff members.

30.     Earlier in the evening, Mr. Bengtson accompanied Ms. Butler and two of her friends (including Ms. Roush) downstairs to a separate basement area of the bar where a non-public restroom was located.  Through Ms. Roush and her connections at the Barley House, Mr. Bengtson and his party were granted access to this normally restricted area, so they did not have to wait for the public bathrooms.

31.     A bouncer on duty at the time allowed the female guests to enter the area but stopped Mr. Bengtson and would not let him through.  Ms. Roush attempted to convince the bouncer that Mr. Bengtson was authorized to be downstairs.  When the bouncer continued to refuse access, Ms. Roush called a Barley House manager, who informed the bouncer that Mr. Bengtson was authorized to be downstairs.  The bouncer consequently let Mr. Bengtson into the "restricted" area.  He did not, at any time, enter the women's restroom.

32.     At approximately 2:30 a.m., Mr. Bengtson and his party began wrapping up their evening and getting ready to leave the bar.  The entire party exited the bar, but shortly after exiting, Ms. Butler and her friends decided to use the restroom one last time before going home in light of the 30-40-minute drive ahead.

33.     Given the late hour, at the request of Ms. Butler's mother, Mr. Bengtson again accompanied Ms. Butler and her friends to the downstairs area where the private bathroom was located.  As noted, Mr. Bengtson was previously told by Barley House management that he was permitted to be in this downstairs area of the bar.  He did not, at any time, enter the women's restroom.

34. While he was waiting for Ms. Butler, Mr. Bengtson was approached by Counterclaim Defendant Richie Madison, a bouncer at the Barley House. The two men engaged in some Smalltalk, but there was no aggression.

35. Once Ms. Roush existed the bathroom, Madison told Mr. Bengtson he was no longer allowed to stand outside the restrooms and had to leave the bar. Ms. Roush reiterated to Madison that Mr. Bengtson was permitted to be in that area of the bar, per earlier discussions in the evening with management. Mr. Bengtson told Madison that he would leave as soon as Ms. Butler came out of the restroom.

36. Madison ignored Ms. Roush's and Mr. Bengtson's reasonable explanation and asked him again to go back upstairs, and began talking over Mr. Bengtson, becoming more and more aggressive in tone. Mr. Bengtson again explained that he would go upstairs as soon as Ms. Butler was finished, and Ms. Roush asked Madison to calm down because Mr. Bengtson was permitted, by Barley House management, to be in that area of the bar.

37. At this point, Madison moved toward Mr. Bengtson in an aggressive manner and, as Mr. Bengtson stepped back to avoid the assault and battery, Madison then forcefully grabbed Mr. Bengtson, and shoved him.

38. In self-defense, Mr. Bengtson resisted Madison's assault and battery. Madison then put Mr. Bengtson in a headlock and, along with several other bouncers whose identities are unknown at this time, dragged Mr. Bengtson up the stairs by his neck.

39. Madison and other Barley House staff continued the altercation with Mr. Bengtson all the way up the stairwell back to the main floor of the bar, at which point Madison let Mr. Bengtson go, and Mr. Bengtson calmly exited the bar alongside another bouncer.

40.     Ms. Butler and Ms. Roush, and at least one other witness present at the time, witnessed Madison's and other Barley House staff's treatment of Mr. Bengtson, and were screaming all the while.  Indeed, Ms. Roush, in a later text message to Mr. Bengtson, confirmed that Madison started the fight and "put his hands on" Mr. Bengtson before Mr. Bengtson ever touched Madison.

41.     During the altercation, Ms. Butler was pushed and fell down the stairwell, and sustained a laceration to her leg.  At one point during the altercation, someone grabbed Ms. Butler's buttocks, but it is not clear who it was.

42.     Mr. Bengtson never consented to any physical contact by Madison or any other employees of the Barley House.

43.     Ms. Butler – who was visibly upset at what had just occurred – joined Mr. Bengtson outside the Barley House.  Both Ms. Butler and Mr. Bengtson were extremely distressed and repeatedly asked members of Barley House staff to help them, asked to speak to a manager, and asked for the name of the bouncer who would later be identified as Madison, but were either ignored, laughed at, or mocked in response, and no help was offered.

44.     Mr. Bengtson and Ms. Butler felt especially disrespected given how much money they had spent that night.  But even being upstanding paying customers was not enough incentive for anyone at Barley House to address the situation in a responsible manner.

45.     Ms. Butler then took out her phone to document what was happening in light of Barley House's disrespectful and violent treatment of her and Mr. Bengtson.

46.     Three Barley House patrons – two female and one male – then approached Ms. Butler; the two women began verbally abusing her, and the male patron, later identified as

21

Counterclaim-Defendant John Vasko, approached Mr. Bengtson with a raised fist, and threatened to "beat" Mr. Bengtson.

47. Vasko told Bengtson that he worked at the Barley House – which later turned out to be false, although Vasko is a "regular" at Barley House – so Mr. Bengtson asked to talk to him, despite the fact that Vasko still had his fists raised. No dialogue occurred.

48. The two female patrons continued to verbally harass Ms. Butler. One of the two – on information and belief, Vasko's girlfriend, who is identified now as Jane Doe 1 – then struck Ms. Butler in the face using her cell phone as a weapon.

49. Vasko then jumped into the fray between the two women and pushed Ms. Butler by her face. Seeing his girlfriend being attacked, Mr. Bengtson grabbed a nearby water bottle and threw it at Vasko to distract his attention and prevent further injury to Ms. Butler.

50. This fight – referred to herein as the first altercation – subsided, and Ms. Butler's mother went to speak to Barley House management. An individual from management told Ms. Butler's mother than Mr. Bengtson had been in the women's bathroom, and that Mr. Bengtson hit Madison first, all of which was blatantly false.

51. Mr. Bengtson and Ms. Butler approached the bar again (with Ms. Butler continuing to use her phone's camera to make a record of what happened), at which point the second female patron – Jane Doe 2 – struck Ms. Butler in the face, also using her phone as a weapon as did Jane Doe 1, starting what is referred to herein as the second altercation.

52. Ms. Butler walked away, phone still recording, when Vasko swiped at her arm to try to knock her phone away, presumably not wanting to be caught on camera engaging in further physical attacks on female patrons. Camera notwithstanding, Jane Doe 1 ambushed Ms. Butler again, and for a third time that night, Ms. Butler was struck in the face with a cell phone.

22

53.     At that time, Vasko had inserted himself into the scuffle again, this time grabbing Ms. Butler by the neck.  Mr. Bengtson, seeing Ms. Butler attacked by Jane Doe 2 and grabbed by Vasko a second time, rushed to her defense, and gently moved Jane Doe 2 aside so he could reach his girlfriend.

54.     In defense of Ms. Butler, Mr. Bengtson punched Vasko in the head to fend him off from doing any further harm to Ms. Butler.

55.     One of the Jane Doe Defendants then came up behind Mr. Bengtson and hit him repeatedly upside his head.

56.     All the while, Mr. Bengtson and Ms. Butler were screaming for help, yet no one from Barley House intervened and no security was present at this time.

57.     Defendant Vasko then savagely attacked Mr. Bengtson, throwing multiple punches and tackling Mr. Bengtson into the flower bed outside the bar.

58.     Barley House and its staff, owners, managers, and principals, had every opportunity to intervene and diffuse the situation, yet failed to do so, resulting in injury to both Mr. Bengtson and Ms. Butler.  Eventually a Barley House bouncer helped Mr. Bengtson out of the flower bed, but it was too little, too late.

59.     Mr. Bengtson, Ms. Butler, and their party departed – with no assistance or escort from Barley House – and Mr. Bengtson went to the hospital for treatment of a broken finger.

60.     Mr. Bengtson called Barley House after the altercation to gather information concerning the identities of those involved and to try to resolve the matter amicably, but was laughed off the phone or otherwise ignored.

23

*Post-Altercation Media*

61.    After the incident, both Mr. Bengtson and Ms. Butler posted their reactions to social media, which posts are the subject of the underlying lawsuit by W.6 and Madison.

62.    On November 28, 2017, Channel 19 News in Cleveland reported on the clashes at the Barley House, allegedly reviewing the Barley House "security tapes" to see what "really happened."

63.    In the report, Defendant May provided commentary to the Barley House security footage, falsely stating that Mr. Bengtson came "out of nowhere" and started "pounding" Defendant Vasko, "totally cheap-shotting him."

64.    In another Channel 19 report, Defendant May also falsely accused Mr. Bengtson of trying to "destroy" Barley House's business "before they even ha[d] a chance to come out and talk to [him] and discuss the situation, which was the problem."

65.    May also falsely stated, during another televised interview with Channel 19 News, that Bengtson was in the ladies' room with his Ms. Butler and her two friends while downstairs in the supposedly "restricted area" of the Barley House.

66.    On November 29, 2017, Mr. Bengtson posted a YouTube video called "The Worst Night of Our Lives" which recounted his side of the story of what happened on November 25, 2017, and refuted the false claims made by May on Channel 19 News.

67.    In that video Mr. Bengtson also retracted several statements from his prior social media posts, apologized for certain misstatements, apologized to the Barley House staff members who were not involved in the altercations, and specifically called on his fans and followers to cease any harassment, threats, or negative review of the Barley House.

24

68.     Despite Mr. Bengtson's call for an end to the conflict in his video, the Counterclaim Defendants saw fit to escalate the matter even further.

*Barley House's "Security Footage" Video*

69.     On November 29, 2017, the Barley House released a 15-minute video purporting to show security footage from the night of November 25, 2017, complete with voice-over commentary by John Doe 1 spinning a one-sided story in the absence of an actual audio track, as well as graphics, special effects, and strategic editing (located at http://www.cleveland.com/metro/index.ssf/2017/12/judge_orders_youtube_star_alis_1.html#incart_m-rpt-1; the "Barley House Video").

70.     The Barley House Video also clearly omits certain portions or angles of footage which would have undermined the Counterclaim Defendants' story. For instance, there is a gap in the security footage between 2:16 and 2:28 a.m., and John Doe 1 makes many unsupported statements purportedly based on the video footage when no such footage is actually shown. The Barley House claims to have released the entire footage, but the tapes released online do not depict the incidents that occurred in the basement.

71.     Defendant George told Mr. Bengtson that he was behind the drafting of the voice-over content contained in the Barley House Video even though the voice-over is delivered by John Doe 1.

72.     The Barley House Video – reported on and posted in full on Cleveland.com on December 1, 2017 – is rife with false and defamatory statements, made even more egregious by W.6 and Madison's flagrant abuse of process in obtaining an unconstitutional TRO after posting the Barley House Video in order to silence Mr. Bengtson and Ms. Butler from further defending themselves from the harmful falsities contained in the video.

25

73.     The Barley House Video starts out by falsely accusing Mr. Bengtson and Ms. Butler of making "direct threats" to Barley House and its employees, and "encouraging" their followers to "lash out" and make horrific death threats and threats to employees' families.

74.     The Barley House Video shows strategically cropped and edited clips of alleged social media posts including threats like "I'll kill you," "I'm gonna snipe [sic] your head off," and "I'm coming for you," which posts the video implies originated from, or were encouraged by, Mr. Bengtson and Ms. Butler, which is completely false.

75.     The Barley House Video falsely claims that it will "not embellish or exaggerate," but that is precisely what the video does, to the substantial injury of Mr. Bengtson and Ms. Butler.

76.     What is even more egregious is that the video asks that the viewer "treat this video as a trial" and states that "you the people are the jury" and that "you make the decision based on the facts," and that the contents of the Barley House Video is "the evidence."  As set forth further below, Barley House made sure that the "trial" was one-sided, that the "evidence" was unrefuted, and that the "jury" only heard one side of the story given that W.6 and Madison procured a TRO immediately after the Barley House Video was posted in order to silence any response from Mr. Bengtson and Ms. Butler.

77.     The Barley House Video states that the bar did not want Mr. Bengtson downstairs because a female manager was alone counting money in the office 15 feet from where Mr. Bengtson was standing.  The insinuation that Mr. Bengtson would somehow act inappropriately or engage in some unlawful activity vis a vis this manager or the bar's money is inescapable, and completely baseless.

78.     The Barley House Video alleges that Defendant Madison approached Mr. Bengtson and calmly explained that he had to leave the restricted area (which is not obvious given the lack of audio track), and that in response, Mr. Bengtson mocks and taunts Madison, and "is continuing to argue about staying in a restricted area," which is also not supported by the footage.  Mr. Bengtson's motions as shown in the video are lighthearted dance moves he performs in countless YouTube videos.

79.     The Barley House Video accuses Mr. Bengtson of being intoxicated and unruly, but this is also not supported by the video, and is disputed by Mr. Bengtson himself.

80.     At around 2:37 in the Barley House Video, the commentator says "[Mr. Bengtson] just assaulted [Madison], he pushed him." Not one identifiable person is visible in the security footage at this point.  Everyone is all the way down the hall from the camera and out of frame.  To the extent anyone can even be seen, the footage in no way shows that Mr. Bengtson assaulted or pushed Madison, let alone that he made first contact with Madison unprovoked.

81.     The same unfounded accusation is made again at around 11:40, where the footage is even more evidently cut before anything incriminating for W.6 and Madison can be seen.

82.     At around 3:00, the Barley House Video states that Madison is "clearly the first one in a headlock" and that the footage proves Mr. Bengtson was not assaulted first.  Again, the footage in no way shows what the John Doe 1 says.  The individuals involved in the fight at this point are obscured by a barrier surrounding the stairwell, and despite the video's attempt to highlight in red the purported parties, it is impossible to tell what is happening in the stairwell, let alone that Madison, and not Mr. Bengtson, is in a headlock.

83.     Seconds later, John Doe 1 again says that Madison was "assaulted by Mr. Banks," which is false, and again at 3:49, John Doe 1 says Mr. Bengtson attacked Madison first.

27

84. In another lie, at around 5:21 of the Barley House Video, John Doe 1 states that Ms. Butler's mother apologized to a Barley House security guard "for what happened." The same baseless allegation is made at around 12:20. She said no such thing.

85. At approximately 6:29 of the Barley House Video, John Doe 1 states "you just saw Mr. Banks throw a glass, that could have seriously hurt somebody." As stated above, Mr. Bengtson threw a water bottle, not a glass, as is evident from the fact that the water bottle bounces in the video (which a glass clearly would not do), as shown in the subsequent seconds. Moreover, on information and belief, Barley House does not even serve drinks in glasses, but rather serves them in plastic cups.

86. At approximately 8:30 of the Barley House Video, John Doe 1 falsely states that Ms. Butler was "instigating" Jane Doe 1.

87. At approximately 8:50-8:55 of the Barley House Video, John Doe 1 states that Mr. Bengtson "comes from behind" and "sucker punche[s]" Defendant Vasko who allegedly "did nothing but try to break up the fight with the two girls." But the video shows that Vasko actually grabbed Ms. Butler by the throat – he was not a peacekeeper as W.6 alleges.

88. At around 12:40 of the Barley House Video, for the first time, John Doe 1 accuses Ms. Butler of "throwing punches" at a bar manager named Dave, although no such thing can be seen in the footage.

89. At 14:55, the Barley House Video misleadingly shows more screen shots of alleged threats from Mr. Bengtson's and Ms. Butler's supposed followers, again with no context, in a highly edited and cropped presentation.

90. John Doe 1 then states that the "level of violence they speak of is unbelievable." Again, these screen shots are of social media posts from third parties, not Mr. Bengtson or Ms.

28

Butler, and show no connection between them and the posts, and Counterclaim Plaintiffs did not encourage or induce such posts, and in fact, expressly discouraged them.

91.     In addition to the numerous defamatory statements in the Barley House Video, W.6 doubled down on the lies by issuing a lengthy statement on their Facebook page also on or about November 30, 2017, falsely stating, among other things, that Mr. Bengtson and Ms. Butler "are instigators, liars, and manipulators," and that they "are trying to use their social media influence to not only destroy our business, but to encourage people to harm our employees physically and emotionally."

*W.6 and Madison's Unlawful TRO, and Barley House's Paid Advertisements*

92.     The Barley House Video ironically concludes with the following statement by John Doe 1: "It's up to you out there to decide who was right and who was wrong, but the complete footage does not lie.  All we ask for is some time to seek the truth; thank you for taking the time to hear our side of the story."

93.     Apparently less concerned with justice and the "truth" and more concerned with stating their case in an online "trial" tried to a jury hearing half the evidence – despite allegedly presenting "the complete footage" – W.6 and Madison took it upon themselves to run to court the very next day, November 30, 2017, and file a lawsuit (the "State Court Action") and motion for an *ex parte* emergency temporary restraining order (the "TRO") that would muzzle Mr. Bengtson and Ms. Butler, preventing them from responding to the false, defamatory, and extremely biased version of the story told in the Barley House Video.

94.     Neither the Counterclaim Defendants nor their attorneys ever gave Mr. Bengtson or Ms. Butler proper notice of the State Court Action, let alone the TRO, and neither of the

29

Counterclaim Plaintiffs had any chance to respond to the papers before the state court judge granted the unconstitutional TRO.

95.     The TRO, among other things, prohibited Mr. Bengtson and Ms. Butler, and anyone "in active concert" with them, from engaging in any of the following activities:

   a. publishing on social media platforms any statements, videos, or images concerning Plaintiffs, their employees, their related entities, and their patrons.

   b. be[ing] present within 500 feet of the Barley House, any of its owners, its employees, or its related entities.

   c. having any contact with the Barley House, any of its owners, its employees, or its related entities. Contact includes, but is not limited to, landline, cordless, cellular, or digital telephone; text; instant messaging; fax; e-mail; voicemail; social networking media; blogging; writing; electronic communications; or communications by any other means directly or through another person.

96.     Armed with this judicially approved expansive prior restraint on speech and the knowledge that Mr. Bengtson and Ms. Butler would be legally prohibited from defending themselves, W.6, George, and Madison proceeded to blast their one-sided and defamatory Barley House Video all over social media – Counterclaim Plaintiffs' primary, if not sole, professional venue and source of income.

97.     Specifically, W.6, George, and Madison placed paid and/or sponsored advertisements on, at very least, Facebook, Twitter, YouTube, and Reddit, featuring the entire 15-minute-18-second Barley House Video, alongside the Barley House crest and logo.

98.     W.6, George, and Madison misused their already unconstitutional TRO to muzzle Mr. Bengtson and Ms. Butler, and blast their vitriol and lies to an audience of hundreds of millions with the knowledge that Mr. Bengtson and Ms. Butler could not respond without being held in contempt of court.

30

99. Mr. Bengtson and Ms. Butler complied with the TRO, although under protest given its blatant violation of the First Amendment, and as a result, suffered significant monetary and reputational harm, as detailed herein.

### *Robert George's Text Messages to Mr. Bengtson*

100. On or about November 30, 2017, Defendant George began taunting Mr. Bengtson by text message, sending him links to disparaging YouTube videos and Reddit threads.

101. Notwithstanding this instigation, Mr. Bengtson attempted to convince George that the parties should sit down and come to a mutually beneficial resolution, that the parties should communicate so something positive could come out of the situation, and that no one, including Mr. Bengtson, acted perfectly the night of November 25, 2017. George refused, indicating that he intended to tell his "side of the story" and that his lawyers would seek an injunction against Mr. Bengtson.

102. That same day, without notice to Mr. Bengtson or Ms. Butler, George's attorneys filed the State Court Action and motion for TRO.

103. The next day, George sent a copy of what he referred to as the "lawsuit" by PDF in an instant message to Mr. Bengtson, and asked him to read it and "call me after u [sic] do," despite the TRO's prohibition on any contact by Mr. Bengtson with W.6, Madison, or any other Barley House employees or owners.

104. George continued to text with Mr. Bengtson, stating that it "is illegal not to follow a court order," that Mr. Bengtson is "not allowed to talk," yet asking if he saw the TRO. George was inviting Mr. Bengtson to violate the TRO.

*Mr. Bengtson and Ms. Butler's Damages*

105.    The Counterclaim Defendants' slander and invasion of privacy have caused significant reputational damages to the Counterclaim Plaintiffs, and their physical brutalization of Mr. Bengtson and Ms. Butler caused both physical and emotional damages, in amounts to be determined at trial.

106.    Counterclaim Defendants' abuse of process also caused Mr. Bengtson and Ms. Butler significant monetary damages by effectively shutting down their respective businesses for a period of two weeks, which in the realm of online social media content, is an eternity.

107.    As discussed above, Counterclaim Plaintiffs earn a living from posting YouTube videos and other social media posts in several ways, including through ad revenues, sponsorships, and merchandise sales.

108.    Mr. Bengtson and Ms. Butler's specific style of content is based on honesty and full transparency into their lives.  They are not "characters"; they document their real-life events, good and bad.  The night of November 25, 2017 was an extremely significant event for them; silencing them from speaking concerning this event was a particularly harmful form of censorship given that their audience expected a response to the Barley House Video.

109.    By being forced to remain silent for more than two weeks, Mr. Bengtson and Ms. Butler were unable to defend themselves, and as such, the public including their audiences and fans, likely drew false conclusions, negatively impacting their relationships and standing within their online communities that they have worked so hard to build.  Their silence likely caused fans to disengage and/or turn to other social media influencers.

110.    The popularity of online personalities like Mr. Bengtson and Ms. Butler is based on their relatability and accessibility to fans, which is facilitated by social media platforms.

32

Censoring their ability to discuss the Barley House incidents online deprived Counterclaim Plaintiffs of not only valuable free speech rights, but their ability to essentially perform their job function by sharing a key moment in their lives with fans who want to understand the situation from multiple perspectives.

111. The speed with which information is disseminated on the Internet underscores the importance of frequently posting content to social media platforms without large gaps of time in between, as was forced by the TRO.

112. While Counterclaim Plaintiffs could, as a technical matter, have posted content unrelated to the incident at the Barley House, to do so would have been to ignore the elephant in the room, and they would have significantly damaged their credibility with their respective audiences. The unlawful TRO presented Counterclaim Plaintiffs with a no-win situation.

113. As a result of Counterclaim Plaintiffs' forced silence, as well as the Counterclaim Defendants' false and defamatory statements about them that were spread, unopposed, in their primary medium of communication, their respective YouTube channels lost viewership and ad revenues.

114. Mr. Bengtson lost more than $200,000 in revenues in December alone (the highest earning month of the year) by being prevented from posting relevant content to his YouTube channel.

115. Ms. Butler has lost approximately $100,000 in revenues in December alone (the highest earning month of the year) by being prevented from posting relevant content to her YouTube channel.

116. Mr. Bengtson and Ms. Butler also lost lucrative sponsorship opportunities both because of the unconstitutional censorship foisted on them by W.6 and Madison, but also as a

result of the Counterclaim Defendants' false and defamatory statements.  Brands looking to partner with Counterclaim Plaintiffs will have conducted due diligence prior to reaching out with any sponsorship offers, and seeing Counterclaim Defendants' false and defamatory Barley House Video and news interviews – to which Counterclaim Plaintiffs could not respond – will have declined to do business with Counterclaim Plaintiffs.

117. Moreover, Ms. Butler lost a potentially lucrative sponsorship deal as a result of the injuries inflicted upon her because the deal would have required her face to be photographed.

118. Damages for lost sponsorships by both Mr. Bengtson and Ms. Butler likely total more than $200,000.

119. Mr. Bengtson also lost merchandise sales as a result of Counterclaim Defendants' unlawful actions.  These damages potentially run into the millions of dollars.

120. Mr. Bengtson receives revenues from sales relating to various proprietary clothing and merchandise lines.  New merchandise was supposed to launch just before Christmas, but the launch was cancelled in light of Counterclaim Defendants' unlawful actions, including their defamation and procurement of the unconstitutional TRO.

121. To promote merchandise with the Barley House incident hanging over his head would have been extremely damaging to Mr. Bengtson's career for the same reasons he was unable to post his typical day-to-day content: his reputation would have been severely tarnished if he had ignored the issue, especially in light of unopposed accusations by Counterclaim Defendants, and went about his business attempting to sell products.  Fans would flee in droves at this perceived lack of integrity and honesty.

122. Further, the partner companies involved in developing and selling the merchandise did not want to move ahead until Mr. Bengtson was able to clear his name in light

of Counterclaim Defendants' false and defamatory statements spread unopposed over the Internet – Mr. Bengtson's professional homefield.

123. With expected sales of these merchandise lines to be in the $1 million per month range, Mr. Bengtson has suffered significant monetary losses.

124. Mr. Bengtson and Ms. Butler have also suffered severe emotional and psychological damages as a result of Counterclaim Defendants' unlawful conduct.

**COUNT I – SLANDER**
**(Against W.6, Robert George, Corey May, and John Doe 1)**

125. Counterclaim Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

126. Defendant George made and/or caused to be made the following false spoken statements and insinuations about or concerning Mr. Bengtson and Ms. Butler by virtue of his admitted role as mastermind and author of the voiceover content in the Barley House Video:

a. Mr. Bengtson started the fight with Madison and assaulted Madison unprovoked;

b. Mr. Bengtson threw a glass at a Barley House patron;

c. Mr. Bengtson "sucker punched" Defendant Vasko, ignoring the fact that Vasko had grabbed Ms. Butler by the throat;

d. Ms. Butler was "throwing punches" at a bar manager named Dave;

e. Ms. Butler instigated Jane Doe 1;

f. Mr. Bengtson and Ms. Butler "speak of" an "unbelievable" "level of violence" based on cropped and out-of-context screen shots of third-party social media users;

g. Mr. Bengtson and Ms. Butler made "direct threats" to Barley House employees and "encourage[ed]" their followers to "lash out" and make horrific death threats to Barley House employees and their families;

h. Mr. Bengtson and Ms. Butler were behind alleged threatening social media posts presented in a cropped and out-of-context manner in the Barley House Video;

i. Mr. Bengtson intended to engage in some sort of inappropriate behavior toward a female manager of Barley House and/or the bar's money.

127. Defendant W.6 made the same false spoken statements about or concerning Mr. Bengtson and Ms. Butler in light of the Barley House Video being attributed to, and being published directly by, the Barley House.

128. Defendant John Doe 1 made the same false spoken statements about or concerning Mr. Bengtson and Ms. Butler in light of John Doe 1's role as the voice of the Barley House Video.

129. The false and defamatory statements in the Barley House Video were published to millions of third parties via the Internet when the Barley House Video was published on YouTube on November 29, 2017, again on Cleveland.com on December 1, 2017, and when W.6 repeatedly republished the Barley House Video embedded in its paid advertisements on social media platforms such as Facebook, Twitter, YouTube, and Reddit.

130. The aforementioned statements were defamatory per se because they reflect negatively on Counterclaim Plaintiffs' character by bringing them into contempt or hatred, and injure their trade and profession.

131.   The false and defamatory statements published in the Barley House Video were not privileged because, for example, they were not statements of opinion or comment, were not true or substantially true, and did not constitute fair or neutral reporting.

132.   Defendants W.6, George, and John Doe 1 acted with the requisite actual malice in light of Mr. Bengtson and Ms. Butler's status as public figures.  That is, W.6, George, and John Doe 1 acted with knowledge of the statements' falsity or reckless disregard of the truth.

133.   Specifically, even if the security footage featured in the Barley House Video had not been doctored, the footage on its face clearly shows what W.6, George, and John Doe 1 are saying is false, yet those Counterclaim Defendants proceeded to publish the false statements anyway, brazenly publishing the security footage with misleading editing, special effects, and misleading voiceover commentary misrepresenting what was clearly on screen or fabricating what was not plain to see.

134.   Examples include, but are not limited to, accusing Mr. Bengtson of throwing a glass when the water bottle in the video clearly bounces, and in light of Barley House not serving drinks in glass containers; accusing Mr. Bengtson of starting the fight with Defendant Madison when the security footage shows no such thing; and presenting third-party social media comments as statements of Counterclaim Plaintiffs (or those made at the direction of Counterclaim Plaintiffs) when such association is facially false.

135.   In his interview in the Channel 19 News report, Defendant May falsely stated that Mr. Bengtson:

    a.   Was "pounding" Defendant Vasko "out of nowhere" and "totally cheap-shott[ed] him";

    b.   Was trying to "destroy" Barley House's business without attempting to talk first;

c.  Was in the ladies' restroom with Ms. Butler and her two friends.

136.  The aforementioned statements were defamatory per se because they reflect negatively on Mr. Bengtson's character by bringing him into contempt or hatred, and injure his trade and profession.

137.  The false and defamatory statements were published to millions of third parties via TV broadcast when May made his false statements on Channel 19 News.

138.  The false and defamatory statements published by May were not privileged because, for example, they were not statements of opinion or comment, were not true or substantially true, and did not constitute fair or neutral reporting.

139.  May acted with the requisite actual malice in light of Mr. Bengtson's status as a public figure.  That is, May acted with knowledge of the statements' falsity or reckless disregard of the truth.

140.  Specifically, even if the security footage featured in the Barley House Video had not been doctored, the footage on its face clearly shows what May said is false, yet he proceeded to publish the false statements anyway.

141.  The statements made in the Barley House Video and by May harm the reputation of Mr. Bengtson and Ms. Butler so as to lower them in the estimation of the community – specifically, the online and social media community in which they live and earn their living – and would tend to deter third persons from associating or dealing with them.

142.  Counterclaim Plaintiffs suffered significant financial damages as a result of the slander by Counterclaim Defendants W.6, George, John Doe 1, and May for the reasons stated above, including with respect to lost ads sales, sponsorships, and merchandise, as well as harm to

their personal and professional reputations and psychological and emotional harm resulting directly from the defamatory statements.

## COUNT II – LIBEL
### (Against W.6)

143.    Counterclaim Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

144.    Defendant W.6 made and/or caused to be made the following false written statement about or concerning Mr. Bengtson and Ms. Butler on the Barley House's official Facebook page on or about November 30, 2017:  Mr. Bengtson and Ms. Butler "are instigators, liars, and manipulators," and that they "are trying to use their social media influence to not only destroy our business, but to encourage people to harm our employees physically and emotionally."

145.    The aforementioned statement was defamatory per se because it reflects negatively on Mr. Bengtson's and Ms. Butler's character by bringing them into contempt or hatred, and injure their trade and profession.

146.    The false and defamatory statement was published to millions of third parties via Facebook.

147.    The false and defamatory statement was not privileged because, for example, it was not a statement of opinion or comment, was not true or substantially true, and did not constitute fair or neutral reporting.

148.    W.6 acted with the requisite actual malice in light of Mr. Bengtson's and Ms. Butler's status as public figures.  That is, W.6 acted with knowledge of the statement's falsity or reckless disregard of the truth.

39

149.    Specifically, even if the security footage featured in the Barley House Video had not been doctored, the footage on its face clearly shows what W.6 said is false, yet W.6 proceeded to publish the false statements anyway.

150.    Neither Mr. Bengtson nor Ms. Butler ever encouraged any of their followers to harass, attack, or harm Barley House employees in any way.  Rather, they explicitly discouraged such behavior.

151.    Neither Mr. Bengtson nor Ms. Butler tried to use social media to "destroy" the Barley House's business, but rather used their platform to exercise their free speech rights to criticize a business whose practices they believe to be unprofessional and whose combination of indifference, instigation, and incompetence, caused them significant damage.

152.    The statement made on the Barley House Facebook page harms the reputations of Mr. Bengtson and Ms. Butler so as to lower them in the estimation of the community – specifically, the online and social media community in which they live and earn their living – and would tend to deter third persons from associating or dealing with them.

153.    Counterclaim Plaintiffs suffered significant financial damages as a result of the libel by W.6 for the reasons stated above, including with respect to lost ads sales, sponsorships, and merchandise, as well as harm to their personal and professional reputations and psychological and emotional harm resulting directly from the defamatory statements.

### COUNT III – FALSE LIGHT
#### (Against W.6, Robert George, John Doe 1, and Corey May)

154.    Counterclaim Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

155.    Counterclaim Defendants W.6, George, and John Doe 1 invaded Counterclaim Plaintiffs' privacy by virtue of the statements set forth above from the Barley House Video,

which gave publicity to a matter concerning Counterclaim Plaintiffs that placed them before the public – *i.e.*, anyone with an Internet connection – in a false light.

156. The false light in which the Barley House Video placed Counterclaim Plaintiffs would be highly offensive to a reasonable person given that the statements therein falsely paint them as violent provocateurs and merciless cyber-bullies.

157. For the same reasons W.6, George, and John Doe 1 acted with actual malice in connection with their slandering of Counterclaim Plaintiffs, they also acted in reckless disregard as to the falsity of the publicized matter and the false light in which Counterclaim Plaintiffs were placed.

158. None of the false statements made by W.6, George, and John Doe 1 was privileged; for example, their statements were not statements of opinion or comment, were not true or substantially true, and did not constitute fair or neutral reporting.

159. Counterclaim Plaintiffs suffered significant financial damages resulting from this invasion of privacy for the reasons stated above, including with respect to lost ads sales, sponsorships, and merchandise, harm to their personal and professional reputations, and emotional and psychological damages.

160. Counterclaim Defendant May invaded Mr. Bengtson's privacy by virtue of his statements to Channel 19 News as set forth above, which gave publicity to a matter concerning Mr. Bengtson that placed Mr. Bengtson before the public – *i.e.*, anyone in Northeast Ohio with a TV – in a false light.

161. The false light in which May placed Mr. Bengtson would be highly offensive to a reasonable person given that his statements falsely paint Mr. Bengtson as a violent provocateur and a deviant who trespasses in women's restrooms.

41

162. For the same reasons May acted with actual malice in connection with his slandering of Mr. Bengtson, he also acted in reckless disregard as to the falsity of the publicized matter and the false light in which Mr. Bengtson was placed.

163. None of the false statements made by May was privileged; for example, his statements were not statements of opinion or comment, were not true or substantially true, and did not constitute fair or neutral reporting.

164. Mr. Bengtson suffered significant damages as a result of May's invasion of privacy for the reasons stated above, including with respect to lost ads sales, sponsorships, and merchandise, as well as harm to his personal and professional reputation, and emotional and psychological damages.

## COUNT IV – ABUSE OF PROCESS
### (Against W.6 and Richie Madison)

165. Counterclaim Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

166. Counterclaim Defendants W.6 and Richie Madison – the Plaintiffs in the underlying action – committed an abuse of the judicial process by virtue of the State Court TRO.

167. W.6 and Madison had a clear ulterior motive in obtaining the TRO: to silence Constitutionally protected free speech in order to dodge criticism of their unprofessional business practices and negligence, and to turn an unfortunate and violent series of altercations on their premises into a marketing opportunity.

168. The Barley House Video specifically asks that the viewer "treat this video as a trial" and that "you the people are the jury" and that "you make the decision based on the facts," and that the contents of the Barley House Video is "the evidence." As set forth above, W.6 and Madison made sure that the "trial" was one-sided, that the "evidence" was unrefuted, and that the

"jury" only heard one side of the story given that W.6 and Madison procured the TRO immediately after the Barley House Video was posted in order to silence any response from Mr. Bengtson and Ms. Butler.

169.    Defendants W.6 and Madison took irregular steps under cover of the TRO after its issuance, namely, spreading their false and defamatory Barley House Video across social media platforms – where they know Counterclaim Plaintiffs make their living and have their audience – through paid advertisements for their bar, knowing that Counterclaim Plaintiffs could not respond on pain of contempt.

170.    These uses of judicial process were not proper in the regular prosecution of the proceeding, and W.6 and Madison misused and misapplied otherwise justifiable process – the TRO – for an end other than that which it was designed to accomplish. Their actions constitute a perversion of the use of the TRO in order to accomplish an unlawful purpose, *i.e.*, to profit from defaming and unconstitutionally censoring Counterclaim Plaintiffs. The remedy of a TRO was never legally intended for such devious purposes.

171.    W.6 and Madison's abuse of process directly and proximately caused significant damage to Mr. Bengtson and Mr. Butler because the TRO effectively shut down their respective businesses for weeks.

172.    Counterclaim Plaintiffs suffered significant financial damages for the reasons stated above, including with respect to lost ads sales, sponsorships, and merchandise, as well as harm to their personal and professional reputations, and emotional and psychological damage.

### COUNT V – BATTERY
**(Against Richie Madison, John Vasko & Jane Does 1 & 2)**

173.    Counterclaim Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

174. Counterclaim Defendant Madison committed battery against Mr. Bengtson when he shoved him, put him in a headlock, and dragged him up the stairs by his neck from the basement of the Barley House.

175. Madison's contact with Mr. Bengtson was unconsented.

176. Madison inflicted unconsented injury upon Mr. Bengtson by striking him, putting him in a headlock, and dragging him up a stairwell by his neck.

177. Counterclaim Defendant Vasko committed battery against Ms. Butler when he used his hand to push her, by the face, during the first altercation outside the Barley House, again when he swiped at her arm to knock her phone away, and a third time when he grabbed her by the throat after one of the Jane Doe Defendants attacked her.

178. Vasko's contact with Ms. Butler was unconsented.

179. Vasko inflicted unconsented injury upon Ms. Butler by pushing her by the face, striking her arm, and grabbing her by the throat.

180. Vasko committed battery against Mr. Bengtson when he punched him and tackled him in front of the Barley House during the second altercation.

181. Vasko's contact with Mr. Bengtson was unconsented.

182. Vasko inflicted unconsented injury upon Ms. Butler by tackling him in a flower bed and striking him repeatedly with his fists.

183. Counterclaim Defendant Jane Doe 1 committed battery against Ms. Butler when she struck Ms. Butler in the face using her cell phone as a weapon.

184. Jane Doe 1's contact with Ms. Butler was unconsented.

185. Jane Doe 1 inflicted unconsented injury upon Ms. Butler by causing her to sustain a black eye and/or split lip.

186.    Counterclaim Defendant Jane Doe 2 committed battery against Ms. Butler when she struck Ms. Butler multiple times in the face using her cell phone as a weapon.

187.    Jane Doe 2's contact with Ms. Butler was unconsented.

188.    Jane Doe 2 inflicted unconsented injury upon Ms. Butler by causing her to sustain a black eye and/or split lip.

189.    Jane Doe 2 also committed battery against Mr. Bengtson when she hit him on the side of the head during the second altercation outside the Barley House.

190.    Jane Doe 2's contact with Mr. Bengtson was unconsented.

191.    Jane Doe 2 inflicted unconsented injury upon Mr. Bengtson by striking him on the ear, breaking his earring.

192.    Mr. Bengtson and Ms. Butler suffered various physical and psychological injuries as a result of the multiple instances of battery set forth above.

193.    Ms. Butler suffered additional pecuniary damages when she lost certain sponsorship contracts requiring her personal appearance and use of her image or likeness because of the unsightly black eye and split lip caused by the battery.

## COUNT VI – ASSAULT
### (Against Richie Madison, John Vasko, & Jane Does 1 & 2)

194.    Counterclaim Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

195.    Madison committed assault against Mr. Bengtson when he threatened, with a threat of force made in a menacing manner, to inflict bodily injury upon Mr. Bengtson with present apparent ability to give effect to that attempt.

45

196. Specifically, Madison moved toward Mr. Bengtson in an aggressive manner, attempted to grab and push Mr. Bengtson, forcing Mr. Bengtson to attempt to avoid harm, and then did, in fact, grab and push Mr. Bengtson.

197. Vasko committed assault against Mr. Bengtson when he threatened, with a threat of force made in a menacing manner, to inflict bodily injury upon Mr. Bengtson with present apparent ability to give effect to that attempt.

198. Specifically, Vasko raised his fist in a move to strike Mr. Bengtson and told Mr. Bengtson that he would "beat" him, and then later tacked and punched Mr. Bengtson.

199. While Vasko made no physical contact with Mr. Bengtson the first time, none is required for Defendant Vasko to have committed assault (and he did later strike Mr. Bengtson).

200. Vasko also committed assault against Ms. Butler by pushing her by her face, swiping at her arm, and grabbing her by the throat, as detailed above, with threat of force to inflict bodily injury.

201. Jane Does 1 and 2 committed assault against Ms. Butler when they threatened, with a threat of force made in a menacing manner, to inflict bodily injury upon Ms. Butler with present apparent ability to give effect to that attempt.

202. Specifically, Jane Does 1 and 2 both used their phones as weapons, swinging said weapon toward Ms. Butler in an attempt to strike her and cause her physical harm, and then did, in fact, strike Ms. Butler in the face multiple times with their phones.

203. Mr. Bengtson and Ms. Butler suffered various physical and psychological injuries as a result of the multiple instances of assault set forth above.

204.    Ms. Butler suffered additional pecuniary damages when she lost certain sponsorship contracts requiring her personal appearance and use of her image or likeness because of the unsightly black eye and split lip caused by the assault.

## Count VII – RESPONDEAT SUPERIOR
### (Against W.6)

205.    Counterclaim Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

206.    W.6 should be held vicariously liable under the doctrine of respondeat superior for the assault and battery committed by its employee, Richie Madison, against Mr. Bengtson, and should be held responsible for all damages flowing therefrom.

207.    Madison was acting in the scope of his employment as a bouncer at the Barley House when he committed his assault and battery on Mr. Bengtson, and was engaged in the service of, and was acting for his employer, W.6 and/or Barley House, in the conduct of his employer's business, at the time of the assault and battery.

## COUNT VIII – NEGLIGENCE
### (Against W.6)

208.    Counterclaim Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

209.    W.6 owed Mr. Bengtson and Ms. Butler a legal duty of care as patrons of the Barley House arising from the foreseeability of the Counterclaim Plaintiffs sustaining injuries from the second altercation outside the bar.

210.    As stated in the Barley House Video, after the first altercation between Counterclaim Plaintiffs, Vasko, and Jane Does 1 and 2, Mr. Bengtson and Ms. Butler did not leave the Barley House premises.

47

211.    Mr. Bengtson and Ms. Butler, for their part, remained on premises to try to speak with someone from Barley House management about what had happened, but were ignored.

212.    Defendant Vasko and Jane Does 1 and 2 also remained on the premises of the Barley House, even after the first altercation.

213.    While Barley House security had broken up the first altercation earlier in the evening, and therefore security and management were aware of the animosity between Counterclaim Plaintiffs, on the one hand, and Vasko and Jane Does 1 and 2, on the other hand, Barley House security and personnel spent most of their time and attention to the altercations that evening taunting Counterclaim Plaintiffs rather than attempting to ensure that their high-paying patrons were safe and protected.

214.    Despite the continuing presence of all the combatants, Barley House security was nowhere to be seen at the time of the second altercation.  Indeed, on more than one occasion in the Barley House Video, John Doe 1 clearly states that Barley House security was not present at the time of the second altercation.

215.    In light of the first altercation, and the presence of all of the participants in that altercation, a second fight was reasonably foreseeable, and W.6 owed a duty of care to Counterclaim Plaintiffs to have security present until everyone had disbursed for the evening. Admittedly, no such security was provided, in breach of W.6's duty of care.

216.    As a result of the lack of security, another fight broke out between Counterclaim Plaintiffs and Vasko and Jane Does 1 and 2, resulting in further physical injury to Ms. Butler by Jane Does 1 and 2, and new physical injuries to Mr. Bengtson caused by Vasko.

217.    The injuries sustained by Counterclaim Plaintiffs were directly and proximately caused by the lack protection afforded by W.6.

## COUNT IX – NEGLIGENT SUPERVISION
### (Against W.6)

218.   Counterclaim Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

219.   Mr. Bengtson and Ms. Roush were both told by Barley House management that Mr. Bengtson was allowed to be present in the purportedly "restricted" basement area of the bar.

220.   Upon information and belief, no one at W.6 informed Madison that Mr. Bengtson was permitted to be in the basement area of the Barley House.

221.   Madison is employed by Defendant W.6.

222.   Madison acted incompetently when he confronted Mr. Bengtson and became aggressive and ultimately assaulted and battered Mr. Bengtson after Mr. Bengtson explained that he was permitted by management to be in the basement area of the Barley House.

223.   W.6 was aware or should have been aware that Madison would act incompetently because it knew its bouncers, such as Madison, would remove patrons from restricted areas unless they had permission to be present in those areas.

224.   Instead, W.6 allowed Madison to assume that Mr. Bengtson was not authorized to be in said area, and sent him after Mr. Bengtson (or allowed him to attack Mr. Bengtson) under the auspices that Mr. Bengtson was acting in a defiant way when he was, in fact, acting with permission of Barley House management.

225.   Madison's assault and battery of Mr. Bengtson caused Mr. Bengtson's injuries.

226.   Defendant W.6's negligence in properly supervising Madison proximately caused Mr. Bengtson's injuries because, had the Barley House properly supervised Madison and told him that Mr. Bengtson was permitted to be in the basement area, Madison would either not have

49

been patrolling that area to begin with, or otherwise would not have become aggressive with Mr. Bengtson and committed assault and battery against him.

227.    Rather than properly supervising Madison and other Barley House bouncers, or informing them of crucial information to prevent physical assault on their patrons, Barley House security and management instead stood by while Counterclaim Plaintiffs were assaulted and mistreated, taunting them throughout the altercations both inside the Barley House and outside.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim Plaintiffs respectfully request the Court enter judgment as follows:

A.  As to Count I, judgment against Defendants George, W.6, John Doe 1, and May in an amount to be proven at trial in excess of $25,000.00 for slander;

B.  As to Count II, judgment against Defendant W.6 in an amount to be proven at trial in excess of $25,000.00 for libel;

C.  As to Count III, judgment against Defendants W.6, George, May and John Doe 1 in an amount to be proven at trial in excess of $25,000.00 for false light;

D.  As to Count IV, judgment against Defendant W.6 and Madison in an amount to be proven at trial in excess of $25,000.00 for abuse of process;

E.  As to Count V, judgment against Defendants Madison, Vasko and Jane Does 1 and 2 in an amount to be proven at trial in excess of $25,000.00 for battery;

F.  As to Count VI, judgment against Defendants Madison, Vasko and Jane Does 1 and 2 in an amount to be proven at trial in excess of $25,000.00 for assault;

G.  As to Count VII, judgment against Defendant W.6 in an amount to be proven at trial in excess of $25,000.00 for respondeat superior;

H.  As to Count VIII, judgment against Defendant W.6 in an amount to be proven at trial in excess of $25,000.00 for negligence;

I.  As to Count IX, judgment against Defendant W.6 in an amount to be proven at trial in excess of $25,000.00 for negligent supervision;

J.  Counterclaim Defendants should be permanently enjoined from engaging in further violations of the laws as set forth above, including without limitation, being ordered to cease and desist from making or causing third parties to make false, defamatory, slanderous, or otherwise damaging statements about Counterclaim Plaintiffs, and requiring Counterclaim Defendants to remove, delete, or otherwise take down any false, defamatory, slanderous, or otherwise damaging statements made or caused to be made about Counterclaim Plaintiffs from any and all locations whether physical or digital;

K.  Defendants George, W.6, John Doe 1, and May should issue corrective statements to remedy their slander and false light violations against Counterclaim Plaintiffs;

L.  Counterclaim Plaintiffs should be awarded punitive or exemplary damages;

M.  Counterclaim Plaintiffs should be awarded reasonable attorney's fees;

N.  Any injunction against Counterclaim Plaintiffs should be dissolved;

O.  The Court should order any other relief the Court deems just and appropriate.

Respectfully submitted,

*/s/ David M. Cuppage*
Robert T. Glickman (0059579)
David M. Cuppage (0047104)
MCCARTHY, LEBIT, CRYSTAL
  & LIFFMAN CO., LPA
101 West Prospect Avenue
1800 Midland Building
Cleveland, Ohio 44115
(216) 696-1422 – Telephone
(216) 696-1210 – Facsimile
rtg@mccarthylebit.com
dmc@mccarthylebit.com

*/s/Scott J. Sholder*
Scott J. Sholder (*pro hac vice*)
COWAN, DEBAETS, ABRAHAMS &
  SHEPPARD, LLP
41 Madison Avenue, 38th Floor
New York, New York 10010
(212) 974-7474 – Telephone
(212) 974-8474 – Facsimile
ssholder@cdas.com

*Attorneys for Defendants*

51

52

## JURY DEMAND

Defendants/Counterclaimants hereby demand a trial by jury to the maximum extent permitted by law.

Respectfully submitted,

/s/ David M. Cuppage
Robert T. Glickman (0059579)
David M. Cuppage (0047104)

## CERTIFICATE OF SERVICE

The foregoing was electronically filed this 16th day of February 2018.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ David M. Cuppage
David M. Cuppage
*One of the Attorneys for Defendants*